**[Cite as *State v. McClain*, 2020-Ohio-952.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-12 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-228 |
| | : | |
| JEFFREY LYNN MCCLAIN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of March, 2020.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, Champaign County Prosecutor's Office, Appellate Division, 200 North Main Street, Urbana, Ohio 43078
      Attorney for Plaintiff-Appellee

CHRISTOPHER B. EPLEY, Atty. Reg. No. 0070981, 10 West Second Street, Suite 2400, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Defendant-appellant Jeffrey Lynn McClain appeals from his convictions and sentences for gross sexual imposition and endangering children. McClain contends that his convictions were not supported by sufficient evidence and that they were against the manifest weight of the evidence. He also claims that the record did not clearly and convincingly support his 13-year prison sentence.

{¶ 2} We conclude the convictions were supported by sufficient evidence and were not against the weight of the evidence. We determine the sentence was not contrary to law, and we are unable to find by clear and convincing evidence in the record that the sentence was unsupported.

{¶ 3} Accordingly, we affirm the judgment of the trial court.

## Course of Proceedings and Evidence Presented

{¶ 4} On December 3, 2018, McClain was indicted on charges of two counts of endangering children, in violation of R.C. 2919.22(B)(5)(E)(4), both felonies of the second degree; rape, in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree; gross sexual imposition, in violation of R.C. 2907.05(A)(4)(C)(2), a felony of the third degree; and two counts of attempted gross sexual imposition, in violation of R.C. 2923.02/2907.05 (A)(4)(C)(2), both felonies of the fourth degree. At the beginning of the March 12, 2019 bench trial, the State moved to dismiss one count of endangering children and the two counts of attempted gross sexual imposition, and the court granted this motion.

{¶ 5} After deliberation at the conclusion of the trial, the court found McClain not guilty of rape, but guilty of a lesser included offense of gross sexual imposition and guilty of the remaining indicted charges of gross sexual imposition and endangering children.

{¶ 6} On March 27, 2019, McClain appeared for sentencing. The court indicated

the two verdicts for gross sexual imposition would merge as allied offenses, and the State elected to proceed with sentencing on the indicted gross sexual imposition. McClain was sentenced to 60 months in prison for gross sexual imposition and eight years in prison for endangering children to be served consecutively for an aggregate sentence of 13 years in prison, and he was classified as a Tier II sex offender with registration requirements for 25 years. McClain filed a timely appeal.

{¶ 7} McClain's charges stem from a June 23, 2017 sleepover where McClain's adopted son, R.M., then 11 years old, had two other boys stay the night at McClain's house. One of the boys, J.Y., then not quite age 11, was a friend of R.M. and the other guest was J.B., J.Y.'s 12-year-old brother. The birthdates of the boys had been stipulated. J.Y. and R.M. were 12, and J.B was 13 at the time of trial.   J.Y. testified as follows:

> A. Okay. So we got there and played Xbox and we ate dinner. Then after that we played Xbox again. Then my brother [J.B.] got a vibrator from Jeff [Appellant McClain] and used it and then he cu[**]ed and Jeff cleaned it up.   And then we ate ice scream (sic).

> Q. Okay. So where did your brother -- let me start over.   How do you know that Jeff got a vibrator for your brother?

> A. Because [R.M.] was talking about it and Jeff heard him and got it out of his room somewhere.

> Q. What did Jeff do after he got it out of his room?

> A. Stand there and watched.   He said, [J.B.] use it. It feels good.

> Q. What did he do with the vibrator?

> A. My brother or Jeff?

Q. Thank you for asking that. That is a great question. Any time I ask a question like that, I need you to ask me to clarify. What did Jeff do with the vibrator after he got it?

A. He gave it to my brother.

Q. And did he say anything to your brother?

A. He said, use it. It feels good.

Q. And what did your brother do?

A. He used it.

Q. How did he use it?

A. He put it on his ba[**]s.

Q. On his ba[**]s?

A. Yeah.

Q. And what was your brother wearing when he put it on his ba[**]s?

A. He had his shirt on but no pants or boxers.

Q. Where were his pants and boxers?   Do you know?

A. On the floor.

Q. Okay. And where were you when this was happening?

A. In the living room playing Xbox.

Q. And where was [R.M.] when this was happening?

A. Playing Xbox with me.

Q. And where was your brother when this was happening?

A. In, like, a recliner chair type thing.

* * *

Q. [Wh]ere was Jeff when this happened?

A. He was behind in the chair. Like, behind the chair where my brother was sitting in.

* * *

Q. After your brother ejaculated, what happened next?

A. Then Jeff got a rag and cleaned it up.

Q. So how did Jeff clean it up?

A. He wiped it up. It was on my brother's clothes and he wiped it up.

(Trial Tr. at 24-26.)

{¶ 8} J.B. testified they were all in the living room when R.M. began talking about the massager. J.B. testified:

Q. And how is it that you got to possess this massager?

A. Jeff gave it to me.

Q. And when Jeff gave it to you, did he say anything?

A. He just said, use it. It will feel good.

Q. Did he tell you how to use it?

A. Yes.

Q. What did he say specifically?

A. He said, put it on your penis. It will feel good.

Q. So what did you do?

A. I did it. I put it on my penis.

Q. What were you wearing when you put it on your penis?

A. I wasn't wearing anything below the waist.

Q. Were you wearing that before he gave you the massager? Were you wearing that before he gave you the massager? [duplicate in original]

A. Yes.

Q. After he gave you the massager what did you do?

A. I took off my pants and underwear and put it on my penis.

Q. Where was Jeff McClain when this --

A. He was standing behind a recliner chair.

Q. Where were you?

A. I was sitting on the recliner chair.

Q. After you put it on your penis, what happened next?

A. Well, white stuff came out of my penis. And then Jeff got a napkin and cleaned it up.

Q. How did he clean it up?

A. With a napkin.

Q. And did he give it to you to clean it up yourself?

A. No, he did it himself.

Q. Where was he when you were using the massager on your penis?

A. Behind the recliner chair.

Q. And did he say anything to you?

A. No. He just standing there and watched me.

(Trial Tr. at 60-62.)

{¶ 9} J.Y. further testified that the boys all went to bed in R.M.'s room. A few hours

later, "Jeff came in and said, you guys want to come sleep with me? And he said, just sleep with me anyway because R.M. is coming in here." (*Id.* at 28.) They all got into McClain's bed with J.B. on one side, then J.Y., R.M. and then McClain. R.M. was already naked, and McClain took off his boxers when he got into the bed next to R.M. "And a few minutes later Jeff [McClain] starts like putting his penis in [R.M.]'s butt. And R.M. starts putting his penis in Jeff's butt." (*Id.* at 34.) J.Y.'s testimony though was unclear. At one point, he explained that "I saw [R.M.] but I didn't see Jeff." (*Id.* at 36.) He later said he did actually see McClain's penis go into R.M.'s butt. (*Id.* at 52.) When asked on cross-examination about R.M. having sex with McClain, J.Y. said R.M. and McClain were both laying down facing away from J.Y., which meant R.M.'s body was between J.Y. and R.M.'s penis. J.Y.'s head was on the pillow, and he did not lift his head to see what was happening except "maybe a few inches." (*Id.* at 52-53.) J.Y. also had testified that when McClain was having sex with R.M., "I was facing toward them [R.M. and McClain] for a second. Then I turned around because I knew what was going on." (*Id.* at 38.) They all slept in McClain's bed the rest of the night. (*Id.* at 39.)

{¶ 10} J.B.'s testimony corroborated that after sleeping a while, he woke up when R.M. stated that R.M. wanted to go in McClain's room. (*Id.* at 63.) All the boys moved into McClain's room and bed. J.B. corroborated their locations in the bed and that they spent the rest of the night there. But he was otherwise non-specific. He said McClain took his clothes off when McClain got into the bed. (*Id.* at 66.) He explained: "I started hearing noises, weird noises, but I didn't look over." (*Id.* at 63.) The "weird noises" consisted of "grunting." (*Id.* at 68.)

{¶ 11} The defense called R.M. to testify. He denied that his father touched him in

any way that night, denied that he had seen McClain naked that night, and denied that McClain had any sexual contact with him. (*Id.* at 112.)  When asked if his dad had a "back massager," he said, "Yes, I think. I don't know." (*Id.*) He denied ever using the massager in any way and denied ever talking to anyone about using it. (*Id.* at 125-126.) He denied that McClain ever would have seen him touching his own private parts and said that if McClain told police he did see such a thing it would "probably be a lie." (*Id.* at 127.) At first, he denied sometimes sleeping in McClain's bed with him. Then, when asked if he ever slept in McClain's bed with him, he said, "I don't know." He then also said that for him to sleep in McClain's bed would be "unusual." (*Id.* at 129.) He also said he did not see anyone masturbate the next morning. (*Id.* at 113.) R.M. stated that he wanted to go home with his dad. (*Id.* at 123.)

{¶ 12} McClain also testified. (*Id.* at 136.)  His adopted son was R.M.; they had lived together since April 1, 2016. McClain testified about pictures of locations from inside his house, pieces of furniture present and location of R.M.'s Xbox. (*Id.* at 141-143.) McClain testified that around 9:30 p.m. the boys all went to R.M.'s room to bed, and McClain went to his room to bed. Later in the night, he felt the bed moving. He explained, "Well, all three boys had gotten in my bed. We all had clothes on." (*Id.* at 155.) He told them to get out of his bed because it was not "proper," and the boys returned to R.M.'s room. (*Id.* at 156.)

{¶ 13} The next morning, while McClain was fixing breakfast, he went into the living area where he claimed he saw R.M. intently focused on playing his Xbox from eight inches away. (*Id.* at 158.) J.Y. was at an end table with his pants pulled down fully erected "waving his head up and down." (*Id.* at 159.) McClain found J.B. in a little rocking chair

with his pants pulled down with McClain's massager in his groin area. (*Id.*) When McClain walked in and asked what they were doing, J.B. "had a climax at that point." (*Id.*) McClain said he grabbed a couple of tissues from a nearby box, handed them to J.B., and told him to clean himself up. (*Id.* at 160.)

{¶ 14} McClain also testified that he has Chronic Inflammatory Demyelinating Polyneuropathy (CIPD), which has caused numbness in his body below his belly button. (*Id.* at 164.) He uses hand controls to drive a vehicle due to this disability. (*Id.* at 170.) He testified he has not been able to have an erection for six years. (*Id.* at 166.) He had never had any kind of sexual relationship with R.M. (*Id.*) And he never tried to get a juvenile, or J.B. in particular, to masturbate in front of him. (*Id.*) He said his "muscle massager" was for leg cramps, and he never used it for self-gratification. (*Id.* at 169)

{¶ 15} On cross-examination the State pointed out some inconsistencies with McClain's testimony and statements he made, or failed to make, at his previous police interviews. (*Id.* at 172-175) He was asked about his statement to police that he had seen R.M. use the massager on R.M.'s penis a "couple of times" (*Id.* at 177-178.), which was contrary to R.M.'s own testimony.

### Sufficiency and Manifest Weight of the Evidence

{¶ 16} McClain's first and second assignments of error challenge the sufficiency of the evidence and contend the verdicts were against the manifest weight of the evidence. When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain a verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support

a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 17} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 18} Although "sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. Accordingly, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Sarr*, 2d Dist. Montgomery No. 28187, 2019-Ohio-3398, ¶ 32. Here, because we believe the verdicts were not against the manifest weight of the evidence, which is dispositive of

the first and second assignments of error, we address manifest weight first.

{¶ 19}  Gross sexual imposition requires proof of the following elements:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

* * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 20}  " 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 21} The weight of the evidence supports a conclusion that McClain and R.M. engaged in two acts of either actual or simulated anal intercourse with each other while naked in McClain's bed. Though McClain argues about what we perceive as minor inconsistencies, the visiting boys corroborated one another's testimony, R.M.'s conflicting, uncertain and variable testimony appeared devised to favor his father, and critical parts of McClain's testimony appeared implausible at best.

{¶ 22}  With regard to the rape charge, the uncertain question was whether the evidence established penetration, which was required for there to be "sexual conduct" constituting rape, as opposed to evidence of "sexual contact" constituting gross sexual imposition. The trial court determined the evidence did not support penetration by proof

beyond a reasonable doubt and, therefore, entered a verdict on that count for the lesser and included offense of gross sexual imposition. Our review of the record and the evidence we have detailed above convinces us that the weight of the evidence supports McClain's conviction on two counts of gross sexual imposition.

{¶ 23}   Child endangering is proscribed in R.C. 2919.22(B)(5) as follows:

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

* * *

(5) *Entice*, coerce, *permit*, *encourage*, compel, hire, employ, use or *allow*, the child to act, model, or in any other way *participate in* or be photographed for the production, *presentation*, dissemination, or advertisement, of any material or *performance* that he knows or reasonably should know is obscene, is *sexually oriented matter*, or is nudity-oriented matter.

(Emphasis added.)

{¶ 24} Under R.C. 2919.22(D)(4), "[s]exually oriented matter means any material or performance that shows a minor participating or engaging in sexual activity, masturbation, or bestiality."

{¶ 25} The evidence supports a conclusion that McClain enticed, permitted encouraged, and allowed J.B. to participate in the presentation of a masturbation performance with the aid of his massager for McClain's benefit. Our review of the record and the evidence we have quoted reveals the weight of the evidence supported the verdict finding McClain guilty of child endangering under R.C. 2919.22(B)(5).

{¶ 26} In a bench trial, "the court shall make a general finding." Crim.R. 23(C). There is no requirement for explanation. Here, however, in explaining its verdicts the trial court found J.Y and J.B. to be credible and found the McClain was not. (Trial Tr. at 207-213.) Credibility primarily is for the trier of fact to determine, but on this record, even without the trial court's explanation, we conclude that parts of McClain's story were incredible on their face. We cannot say this is an exceptional case in which the evidence weighed heavily against the conviction. The first and second assignments of error are overruled.

### McClain's Sentences

{¶ 27} McClain's third assignment of error states: "The record does not clearly and convincingly support McClain's sentence." An appellant can challenge consecutive sentences by (1) claiming the sentence is contrary to law because the trial court failed to make the R.C. 2929.14(C)(4) findings or (2) arguing that the record does not support the R.C. 2929.14(C)(4) findings made. *State v. Wiesenborn*, 2d Dist. Montgomery No. 28224, 2019-Ohio-4487, ¶ 15. Although the assignment of error does not specify which challenge is being made, the narrative argument refers to the preference for concurrent sentences, McClain's minimal record, and his previous community activities. We interpret this to be a contention that the record does not support consecutive-sentence findings. The standard applied to such a review is whether clear and convincing evidence exists in the record to demonstrate that the record does not support the trial court's R.C. 2929.14(C)(4) consecutive-sentence findings. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22-23.

{¶ 28} Sentencing was conducted on March 27, 2017. The trial court indicated it

had reviewed a presentence-investigation report and medical documentation provided by McClain. McClain was informed of his registration duties as a Tier II sex offender. The trial court heard a victim-impact statement from the mother of J.Y and J.B., including adjustment difficulties and poor school performance that had arisen. The trial court heard from the prosecutor, defense counsel, and McClain. The trial court asked McClain about his medical conditions, his foster parenting, and his community service.

{¶ 29} At sentencing, the trial court indicated it considered the purposes and principles of sentencing in R.C. 2929.11. The trial court also said it considered the seriousness of the conduct and the likelihood of recidivism. The trial court specifically referred to multiple factors enumerated in R.C. 2929.12. The trial court noted that there were two children who were the subject of separate acts of criminal conduct committed in the vicinity of a third child. McClain's relationship with the children facilitated the offense, as he was the adoptive father of one child and in loco parentis of the others. The trial court recognized the nature of the offense was more serious because McClain believed his adoptive son previously had been the victim of sexual abuse. The trial court found the visiting children were lashing out at home and school, and grades were slipping. One child moved to another school district, and the other had to change schools. And one child had been in trouble with the law. The trial court recognized that McClain's roles as a foster parent and Cub Scout leader had facilitated the offenses by the trust that parents and the community had placed in him. Finally, the trial court found that the McClain showed no genuine remorse for the offenses and that none of the statutory less-serious factors applied. Each of these conclusions found support in the record.

{¶ 30} Regarding potential for recidivism, the trial court acknowledged that

McClain had no prior criminal record, but it also found that subsequent to the sleepover events, McClain had a conviction for disorderly conduct for slapping R.M. in the face. Although the trial court regarded the potential for recidivism involving the visiting boys as not likely, it recognized that McClain actively was attempting to regain custody of R.M. In addition, McClain was involved in these offenses despite the training about social boundaries he encountered as a foster parent, a CASA volunteer, a Cub Scout leader, and a Big Brother. The trial court considered McClain's military service and determined that was not a contributing factor in the offenses. Both of the sentenced offenses carried a presumption of a prison term, and the trial court found that presumption was not rebutted. It then imposed prison sentences of five years and eight years respectively.

{¶ 31} Thereafter, the trial court made the findings required by R.C. 2929.14(C)(4). In particular, it found that consecutive sentences were necessary to protect the public from future crime and to punish the defendant. It also found that consecutive sentences were not disproportionate to the seriousness of the McClain's conduct and the danger he posed to the public, and that two or more of the multiple offenses were committed as part of a course of conduct and the harm caused was so great or unusual that no single prison term adequately reflected the seriousness of the conduct. This recitation legally satisfies R.C. 2929.14(C)(4). The trial court was not required to provide reasons to support its findings. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37; *State v. Hayes*, 2d Dist. Clark No. 2014-CA-27, 2014-Ohio-5362, ¶ 10. Nonetheless, the trial court reiterated that three minors were involved in or exposed to sexual activity, and McClain participated in one offense and was an active observer in the other, all while he was in the position of a parent or in loco parentis.

**{¶ 32}** Upon review, we are unable to find by clear and convincing evidence in the record that the consecutive sentences were unsupported. To the contrary, the offenses involved separate victims, involvement of a third minor, serious resulting harm, no remorse, and an attempt to re-engage supervision of R.M. The third assignment of error is overruled.

## Conclusion

**{¶ 33}** We have overruled each of McClain's assignments of error. The judgment of the Champaign County Court of Common Pleas is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Jane A. Napier
Christopher B. Epley
Hon. Nick A. Selvaggio