[Cite as *State v. Dillion*, 2023-Ohio-777.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                              :

      Plaintiff-Appellee,                        :               No. 21AP-666
                                         (C.P.C. No. 18CR-1274)

v.                                                         :

                                                (REGULAR CALENDAR)

Christian D. Dillion,                                      :

      Defendant-Appellant.                       :

---

D E C I S I O N

Rendered on March 14, 2023

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** *Blaise G. Baker*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Christian D. Dillion, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty of aggravated burglary, aggravated robbery, aggravated murder, murder, felonious assault, tampering with evidence, and having weapons while under disability. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} By indictment filed April 27, 2018, plaintiff-appellee, State of Ohio, charged Dillion with one count of aggravated burglary, in violation of R.C. 2911.11, a first-degree felony; one count of aggravated robbery in, violation of R.C. 2911.01, a first-degree felony; three counts of aggravated murder, in violation of R.C. 2903.01, unclassified felonies; two counts of murder, in violation of R.C. 2903.02, unclassified felonies; one count of attempted murder, in violation of R.C. 2923.02 and 2903.02, a first-degree felony; one

count of felonious assault, in violation of R.C. 2903.11, a second-degree felony; one count of tampering with evidence, in violation of R.C. 2921.12, a third-degree felony; and one count of having weapons while under disability, in violation of R.C. 2923.13, a third-degree felony.   All the charges except for the tampering with evidence charge and having weapons while under disability charge contained accompanying firearm and criminal gang specifications pursuant to R.C. 2941.145(A) and 2941.142.   The felonious assault charge contained an additional pregnant victim specification pursuant to R.C. 2941.1423.   The charges related to the shooting deaths of Brian Keith Williams, III and Marlazia Lashonda Jones-Mattox on or about January 1, 2018.   Dillion entered a plea of not guilty.   The state subsequently moved to dismiss the attempted murder charge and the pregnant victim specification attached to the felonious assault charge.

{¶ 3}   Prior to trial, the state notified the defense, pursuant to Evid.R. 804(B)(6), that it intended to rely on statements made by an unavailable witness, K.C.   The trial court conducted a pretrial hearing on November 15, 2021 related to the state's request to use the statements under the forfeiture by wrongdoing exception to the hearsay rule.   During the hearing, Jerry Orick, a detective with the Columbus Division of Police, testified that he learned in late September 2021 that K.C., a witness for the state, had sent a letter to his attorney indicating he was no longer willing to provide testimony in the state's case against Dillion because he was in fear for his life and the lives of his family members.   Detective Orick read K.C.'s letter aloud during the hearing.   In the letter, K.C. stated that Dillion "is sending threats to my family through people being released from jail and some gang members [K.C. is] familiar with."   (Nov. 15, 2021 Tr. Vol. I at 9.)   As a result of the threats, K.C. wrote his "family is in fear for their lives" and he "no longer want[s] anything to do with [the state's] case due to the continuing of threats being made to my family and all the high risk situations I've been faced with."   *Id.*   K.C. stated he "will not be a witness at [the state's] trial" and that he wanted Dillion to be made aware that he was withdrawing his previous statements to the prosecution and would no longer cooperate in the state's case so that "my family will be safe."   *Id.*   In the letter, K.C. asked his attorney to "[p]lease hurry" because his family's "lives are at risk," and the people making threats "said I have [two] weeks to withdraw my statement or they are killing my family."   *Id.*   At the end of the letter,

K.C. asks his attorney not to ignore his pleas, to inform the courts, and to "[h]elp please." *Id*. at 10.

{¶ 4} Detective Orick testified he met with K.C. and his counsel on September 30, 2021 at which time K.C. verified he wrote the letter. K.C. told Detective Orick that he would cooperate were it not for the threats. Detective Orick further testified that K.C. was concerned because he knew that his prior interview with police had been transcribed, had been disclosed during discovery, and that K.C. learned that Dillion had a copy of the transcript in his jail cell. K.C. told Detective Orick that the threats to his family were made by other gang members. Additionally, Detective Orick stated K.C. was worried because K.C.'s family's house had been shot up while the family was inside. Detective Orick looked into the matter and learned that a shooting at K.C.'s family home had been reported to police on April 23, 2019, and when Detective Orick visited the home, he saw evidence of gunshots penetrating the kitchen wall, the living room walls, and a bathroom wall.

{¶ 5} After he received K.C.'s letter, Detective Orick stated he spoke with multiple family members who confirmed they had been threatened. Those family members indicated they were afraid for their safety, and they believed the threats were coming from Dillion.

{¶ 6} Detective Orick described K.C. as visibly agitated, shaken, and scared during the September 30, 2021 meeting. Detective Orick facilitated a phone call with a family member of K.C. and stated the family members were scared for their lives. The family members told K.C. again not to testify out of fear for K.C. and fear for the safety of their family. After the phone call, K.C. reiterated that he was not going to testify due to fear for his own safety and the safety of his family. Detective Orick stated that K.C. again stated that all the threats were coming through Dillion by way of other members of Dillion's gang.

{¶ 7} Upon conclusion of his meeting with K.C., Detective Orick obtained a search warrant for documents in Dillion's possession at the Franklin County Jail. Police executed the search warrant the next day and found a transcript of K.C.'s police interview in Dillion's cell. The trial court conducted an in camera inspection of the materials found in Dillion's cell and noted that the transcript of K.C.'s statement was "highlighted and marked up." (Tr. Vol. I at 32.) Finding the state had met its burden of demonstrating, by a preponderance of the evidence, that K.C. was unavailable to testify because of Dillion's wrongdoing and

that one purpose of Dillion's wrongdoing was to prevent K.C. from testifying, the trial court ruled K.C.'s statements to police about the conversations he had with Dillion while they were both at the Franklin County Jail would be admissible under the forfeiture by wrongdoing exception to the hearsay rule.

{¶ 8} The trial court conducted a second pretrial hearing on November 16, 2021 during which K.C. appeared by video. K.C. reiterated he would not testify, stating he wanted "nothing to do with this case" because of the reasons he had already provided to his attorney and police, including the threats to him and his family. (Nov. 16, 2021 Tr. Vol. II at 250-51.) K.C. repeatedly stated he would not testify because of ongoing threats, explaining that his family has begged him not testify and saying, "I don't know how many times I have to tell you guys that." *Id.* at 253.

{¶ 9} Following K.C.'s testimony, defense counsel asked that the trial court nonetheless enforce the subpoena and require K.C. to testify, arguing K.C. was not truly unavailable but was choosing not to cooperate. The trial court found by a preponderance of the evidence, however, that K.C. was unavailable to testify as that term is used under the doctrine of forfeiture by wrongdoing.

{¶ 10} Dillion elected to waive his right to a jury trial on the having weapons while under disability charge. The trial court conducted a jury trial on the remaining charges beginning November 15, 2021. During the trial, M.M. testified she was visiting her friend on South Hague Avenue on January 1, 2018 when, around 11:30 or 11:45 p.m., she heard gun fire. M.M. stated she and her friend got out of the car and she then saw a man come outside and yell at her to call the police, saying someone had been shot.

{¶ 11} T.M. lived across the street from Williams' residence. T.M. worked for a security company and was licensed to carry a concealed weapon. T.M. testified he did not know the residents across the street from him on South Hague Avenue, but he observed what he believed was drug trafficking activity at the residence. Between 11:30 p.m. and midnight on January 1, 2018, T.M. stated he was watching TV when he heard a noise that he at first thought was someone playing drums. When he looked out his window, T.M. stated he saw a woman pulling at the blinds of a window of the house across the street and attempting to get out of the house. T.M. testified he grabbed his gun, called 911, and ran to assist the woman. As he was running toward the woman, T.M. stated he heard more gun

shots and he could hear the woman screaming for help. When he was closer to the house, T.M. said he could see a man inside the home shooting the woman in the back three or four times as she was halfway out the window.

{¶ 12} T.M. testified he then went around the side of the home and saw a silver or gold SUV parked behind the car facing south. His gun had an attached light, and T.M. said he pointed the gun and light at the vehicle at which time T.M. believed he saw the shooter get into the vehicle. T.M. then fired his weapon toward the vehicle, but the vehicle left the scene. T.M. waited at the home for police to arrive.

{¶ 13} Officer Ehryn Kinzel of the Columbus Division of Police testified that on the evening of January 1, 2018, she was dispatched to South Hague Avenue after reports of shots fired. On the front porch of the house, first responders found Jones-Mattox, who was pregnant, unresponsive with visible gunshot wounds to her abdomen. Inside the house, officers found Williams and D.W., who was 15 years old at the time. Both Williams and D.W. had been shot multiple times. D.W. had been shot seven times, including two gunshots to his head. D.W. survived the shooting but has a traumatic brain injury and is triplegic. Williams and Mattox-Jones both died as a result of the gunshot wounds.

{¶ 14} A subsequent autopsy indicated Jones-Mattox had been shot multiple times in the buttocks and torso. Among her injuries, bullets perforated Jones-Mattox's kidney, liver, and uterus. Jones-Mattox was 35 weeks pregnant when she died, and her unborn child survived the shooting and was delivered at the hospital. Williams' autopsy indicated he had been shot nine times, including shots to his chest, abdomen, and back. The forensic pathologist was able to recover three bullets from Jones-Mattox's body and four bullets from Williams' body.

{¶ 15} In January 2018, A.R. had been dating Dillion for approximately 10 months. A.R. described her relationship with Dillion as having highs and lows, and she said Dillion had anger issues. A.R. testified she knew Dillion was in a gang called the Hilltop Hot Boys. A.R. stated she spent time with Dillion, who went by the name Young Christian or YC, and his friends and fellow members of the Hilltop Hot Boys. A.R. identified co-defendant Wade, who went by the nicknames Tittie Boy or Tit, and D.W., who used the nickname Dooda, as also being members of the Hilltop Hot Boys. During her relationship with Dillion, A.R. stated she frequently drove Dillion and his friends around in her gray four-door Hyundai.

{¶ 16} A.R. testified she also knew Williams because she had accompanied Dillion and his friends on multiple occasions to Williams' residence to buy marijuana or smoke it. Though she said she did not know Jones-Mattox, A.R. said she had seen Jones-Mattox on a couple of occasions in Williams' home and knew that Williams and Jones-Mattox were dating at that time. A.R. also said that, prior to January 1, 2018, she had seen Dillion, Wade, and D.W. all carrying firearms.

{¶ 17} On the evening of January 1, 2018, A.R. said she was with Dillion, Wade, and D.W. at a friend's house smoking marijuana and taking pills. A.R. had taken a photo the night before of Wade holding a gun. When A.R. indicated she needed to leave, she said Dillion became angry and the two got into a physical altercation. The altercation left A.R. with an injury behind her ear, and she photographed the injury the next day. A.R. said she, Dillion, Wade, and D.W. were asked to leave for disturbing the residents of the house.

{¶ 18} A.R. testified the group had initially planned to go purchase more marijuana. However, once they were back in A.R.'s car, A.R. said that D.W. suggested they rob Williams instead of buying marijuana from him. A.R. testified she then drove the group to Williams' residence, parking in the back. A.R. said she remained in the car while Dillion, Wade, and D.W. went into Williams' home. A.R. testified she did not see Dillion, Wade, or D.W. with firearms as they entered the home.

{¶ 19} Dillion left his phone in the car with A.R., and A.R. stated the phone rang while she was waiting in the car. When she answered the call, A.R. said she directed the caller, who was driving a silver SUV, to park in front of her car behind Williams' residence. A.R. testified she knew Dillion planned to sell drugs to the individuals in that vehicle.

{¶ 20} When Dillion and Wade returned to her car, A.R. testified she thought she heard gunshots, though she denied hearing any gunshots coming from the residence while the men were inside. Once Dillion and Wade were back in the car, A.R. said she drove away from Williams' residence. Because D.W. did not return to the car, A.R. said she asked where he was and Dillion told her that D.W. was dead. A.R. described Dillion as visibly upset and said he put a gun to his head as if he was going to shoot himself, but A.R. and Wade took the gun from Dillion and A.R. drove away.

{¶ 21} A.R. testified she then drove Dillion to his house so he could change his clothes and then proceeded to her mother's house. When they were leaving her mother's

residence, A.R. said Wade instructed her to stop the car. A.R. said Wade got out of the car and put one of the guns in the sewer by A.R.'s mother's home. A short time later, A.R. said she stopped the vehicle on October Ridge so that Dillion could get out of the car and place two more guns in a sewer at that location.

{¶ 22} While they were in the car, A.R. said Dillion told her what happened inside Williams' residence. A.R. said that Dillion explained that when they got to Williams' door, D.W. had his gun out and cocked. Dillion told her that D.W. tried to fire his gun but that the gun jammed, at which point Williams started shooting at D.W. In an attempt to avoid the gunfire, Dillion told A.R. he dropped down and that Wade shot Williams. When they were about to leave, Dillion said he and Wade heard Jones-Mattox screaming and trying to climb out a window. A.R. testified that Dillion told her that he took Wade's gun and shot Jones-Mattox, later explaining he had to do it because "no face no case." (Nov. 17, 2021 Tr. Vol. III at 641.) Further, A.R. said neither Dillion nor Wade had any drugs or money with them when they returned to the car. However, A.R. testified that Dillion and Wade took a firearm from Williams' residence.

{¶ 23} Several days after the shooting, A.R. said she and Dillion picked up Dillion's friend "Juany." Id. at 570. While Juany was in the back seat of A.R.'s car, A.R. said Juany noticed a gun with green camouflage under the driver's seat. A.R. said Dillion told her it was Williams' gun, so A.R. stopped the vehicle at an apartment complex near a river where Juany threw the gun into the water.

{¶ 24} Although A.R. initially lied to police about her knowledge of the events of January 1, 2018, she later agreed to cooperate with the police investigation and surrendered her phone with consent to search. Additionally, A.R. showed police each of the locations where the guns had been dropped, and law enforcement officers were able to recover guns from each of the locations A.R. identified, including a handgun recovered from the Big Walnut Creek.

{¶ 25} As part of the investigation, police discovered surveillance footage from the back door of a residence near Williams' home. The state played the surveillance footage for the jury. A.R. identified her car in the footage, and she testified that when the vehicle dome light was on, she was in the car with Dillion, Wade, and D.W. smoking marijuana. The footage then shows three individuals, who A.R. identified as Dillion, Wade, and D.W., going

into the gate by the garage while A.R. stays in the vehicle. At 11:42 p.m., the footage shows a silver SUV pull up by A.R.'s car. Approximately three minutes later, the footage shows a man, who A.R. identified as Wade, get into her car. The SUV is partially obstructing the view of her vehicle, but A.R. testified that Dillion also got into her car at that point. While the men were getting into the car, the footage shows flashes of light from a firearm, and A.R. testified that is the time she heard gunshots.

{¶ 26} The state also charged A.R. for her involvement in the events of January 1, 2018, and she agreed to testify on behalf of the state in Dillion's case in exchange for a guilty plea to one count of aggravated robbery and the recommendation of a reduced sentence.

{¶ 27} Officer Eric Clouse, an expert in identifying criminal street gangs and members, testified regarding the gang history in the Hilltop area. Officer Clouse testified he had worked in the area for 18 years and knew Dillion, Wade, and other individuals who were known members of the Hilltop Hot Boys. Having spent so much time in the area, Officer Clouse said he would frequently see Dillion associating with other members of the Hilltop Hot Boys, and he testified that Dillion has a tattoo of the letters "HB" to reflect Dillion's participation in that gang. (Nov. 18, 2021 Tr. Vol. IV at 768.) Additionally, Officer Clouse testified that D.W. and Wade have gang affiliation tattoos, and Wade had previously been convicted for violent offenses with gang specifications.

{¶ 28} Law enforcement officers apprehended Dillion and Wade on March 7, 2018 following an attempt to pull over a vehicle for a traffic violation. The driver of the vehicle did not comply, hitting a fire hydrant on Binns Road but continuing to drive, and police did not pursue the vehicle but aired a description of it and its direction of travel. Officer Clouse was in the area and heard the report, eventually finding the vehicle near Sullivant Avenue. Following a brief pursuit on foot, Officer Clouse arrested Dillion and Wade who both had active warrants at the time.

{¶ 29} DNA testing on a handgun recovered from the Binns Road scene excluded Dillion as the major contributor and identified Wade as the major contributor. Further ballistics testing on all the guns, bullets, and casings recovered in the case indicated the bullets recovered from the victims' bodies and the casings found at the scene were related to the guns recovered from the sewer on Red Leaf Lane, the sewer at Dennis Lane, and Big Walnut Creek.

{¶ 30} After Dillion was arrested, Officer Clouse found social media posts about Dillion with what he described as gang commentary. The social media posts included photos of Wade holding guns, a photo of Wade and Dillion, and photos of Dillion holding guns in each hand. Officer Clouse testified that Dillion was an active member of the Hilltop Hot Boys gang on January 1, 2018.

{¶ 31} Following his arrest, Dillion was housed in the Franklin County Jail in a cell near another inmate, K.C. K.C. provided information to Detective Arthur Hughes that Dillion had discussed his case with K.C. Law enforcement recorded K.C.'s interviews, and the state played those recordings for the jury pursuant to the trial court's pretrial ruling on forfeiture by wrongdoing.

{¶ 32} In the interview, K.C. states he was a member of another gang, the Bomb Squad, and had known Dillion for about five years. K.C. said his gang had no issues with Dillion's gang. According to his statements during his police interview, K.C. had asked Dillion about why he was incarcerated, and Dillion started talking about his case. K.C. said Dillion told him that he, Wade, and D.W. planned to rob and kill Williams and then kill everyone else in the house. Dillion also told K.C. that his girlfriend was the getaway driver. Dillion told K.C. his girlfriend drove the three men to Williams' residence but that once they went inside the residence there was an argument and "stuff went wrong." (Tr. Vol. III at 661-62.) K.C. said Dillion told him that Williams shot D.W. multiple times. Additionally, K.C. said Dillion told him that he killed "the baby mom" because he did not want to leave any witnesses. *Id*. at 663. K.C. stated that Dillion explained he needed to kill all the witnesses because he did not want to make the same mistake that an associate, they both knew, had made by leaving witnesses in a separate crime.

{¶ 33} Following deliberations, the jury found Dillion guilty of aggravated burglary, aggravated robbery, three counts of aggravated murder, two counts of murder, one count of felonious assault, and one count of tampering with evidence, as well as the accompanying firearm and gang specifications. After a stipulation of the parties related to Dillion's prior convictions, the trial court found Dillion guilty of having a weapon while under a disability.

{¶ 34} The trial court then conducted a sentencing hearing on November 30, 2021 and sentenced Dillion to an aggregate term of 78 years to life in prison. The trial court

journalized Dillion's convictions and sentence in a December 8, 2021 judgment entry. Dillion timely appeals.

## II. Assignments of Error

{¶ 35} Dillion assigns the following two assignments of error for our review:

> [I.] The trial court committed reversible error and an abuse of discretion when it allowed otherwise inadmissible hearsay testimony under the Forfeiture by Wrongdoing Exception in Evid. R. 804([B])(6) in violation of Defendant-Appellant's rights under the Confrontation Clause of the Sixth and Fourteenth Amendments to the United States Constitution and Ohio Constitution[,] Article [I], Section 10.
>
> [II.] Defendant-Appellant's convictions for Aggravated Burglary, Aggravated Robbery, Aggravated Murder, Murder, and Felonious Assault were not supported by sufficient evidence and/or were against the manifest weight of the evidence.

## III. First Assignment of Error – Forfeiture by Wrongdoing

{¶ 36} In his first assignment of error, Dillion argues the trial court erred when it admitted into evidence the recordings of K.C.'s statements to law enforcement under the forfeiture by wrongdoing exception contained in Evid.R. 804(B)(6). Dillion asserts the admission of the testimony violated his rights under the Confrontation Clause of the Sixth and Fourteenth Amendments to the United States Constitution and Ohio Constitution, Article I, Section 10.

{¶ 37} A statement is impermissible hearsay when it is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C) and 802. However, pursuant to Evid.R. 804(B)(6), a statement that is offered against a party is not excluded by the hearsay rule if the declarant is unavailable as a witness and "the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." This rule is known as the doctrine of forfeiture by wrongdoing. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 96.

{¶ 38} The doctrine of forfeiture by wrongdoing creates an equitable exception to a defendant's constitutional right to confront the witnesses against him or her. *State v. Bias*, 10th Dist. No. 21AP-329, 2022-Ohio-4643, ¶ 59, citing *McKelton* at ¶ 96, citing *Giles v. California*, 554 U.S. 353, 366 (2008). Codified at Evid.R. 804(B)(6), the doctrine of

forfeiture by wrongdoing permits the state to use hearsay statements of an unavailable witness if the state can show, by a preponderance of the evidence, that " '(1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify.' " *Bias* at ¶ 59, quoting *McKelton* at ¶ 96, citing *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 106, and *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 84. A preponderance of the evidence means "the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, ¶ 54.

{¶ 39} The forfeiture by wrongdoing exception applies to defendants who "seek to undermine the judicial process by procuring or coercing silence from witnesses." *Davis v. Washington*, 547 U.S. 813, 833 (2006). The state need not establish that the defendant's sole purpose was to prevent the witness from testifying; instead, the state must only show that the defendant's wrongdoing causing the witness's unavailability " 'was motivated *in part* by a desire to silence the witness.' " (Emphasis sic.) *Bias* at ¶ 59, quoting *Hand* at ¶ 90. Further, the type of wrongdoing contemplated by the rule " 'need not consist of a criminal act.' " *State v. Donlow*, 7th Dist. No. 21 MA 0046, 2022-Ohio-1518, ¶ 32, quoting *State v. Henderson*, 7th Dist. No. 16 MA 0057, 2018-Ohio-5124, ¶ 21.

{¶ 40} Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Abdullahi*, 10th Dist. No. 18AP-222, 2018-Ohio-5146, ¶ 17, citing *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 16, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001); *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983) (an abuse of discretion connotes a decision that was unreasonable, arbitrary, or unconscionable). However, where the evidentiary ruling implicates the Confrontation Clause, we review the ruling de novo. *Bias* at ¶ 60, citing *McKelton* at ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir.2010).

{¶ 41} Here, Dillion argues the state failed to prove a link between his own actions and K.C.'s unavailability. More specifically, Dillion asserts that even if K.C.'s family was receiving threats, the state did not provide direct evidence that Dillion was the person making those threats.

{¶ 42} "Circumstantial evidence is the 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.' " (Internal quotations and citation omitted.) *State v. Robinson*, 10th Dist. No. 17AP-5, 2018-Ohio-1809, ¶ 20, quoting *State v. Griesheimer*, 10th Dist. No. 05AP-1039, 2007-Ohio-837, ¶ 26. Circumstantial evidence has the same probative value as direct evidence. *Robinson* at ¶ 20 (noting "circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt"); *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 120. While Evid.R. 804(B)(6) requires the state to prove forfeiture by wrongdoing by a preponderance of the evidence, there is nothing in the rule requiring the state to rely only on direct evidence in satisfying its burden. Instead, a court considering the admissibility of a statement under the doctrine of forfeiture by wrongdoing may make "rational inferences" from the evidence presented by the state to determine whether the defendant participated in procuring the witness's absence with the intent to prevent the witness from testifying. *State v. Austin*, 7th Dist. No. 16 MA 0068, 2019-Ohio-1185 ¶ 39; *Henderson*, 2018-Ohio-5124, at ¶ 32 (noting rational inferences are permissible from the state's circumstantial evidence of defendant's involvement, and concluding the defendant's "involve[ment] in intentionally procuring the witness's unavailability is more likely than his claim that he was not involved in such procurement"). (Internal quotations and citation omitted.)

{¶ 43} Having reviewed the evidence presented by the state at the pretrial admissibility hearings, we conclude the evidence presented, the accompanying surrounding facts and circumstances, and the available rational inferences demonstrate, by a preponderance of the evidence, that Dillion engaged in wrongdoing that caused K.C. to be unavailable with the purpose to prevent K.C. from testifying. Dillion maintains that even if K.C.'s family was receiving threats related to K.C. testifying, there was no evidence that Dillion was the one making the threats. However, the doctrine of forfeiture by wrongdoing does not require that a defendant be the one to personally contact a witness; rather, a defendant can intentionally procure a witness's unavailability from trial through other people acting on the defendant's behalf. *State v. Paskins*, 5th Dist. No. 2021 CA 00032, 2022-Ohio-3810, ¶ 41, citing *Henderson*, 2018-Ohio-5124, at ¶ 24, citing *Giles* at 361.

Moreover, Dillion's argument ignores crucial portions of the evidence presented at the forfeiture by wrongdoing hearing. Though Dillion asserts the only link to his involvement was speculation from K.C. and K.C.'s family members, K.C. expressly wrote in his letter to his counsel that Dillion was behind the threats and was directing other people getting out of jail to threaten K.C.'s family once they were released from custody. Detective Orick also testified that he had experienced "numerous times" where an incarcerated individual is able to send threats through other individuals. (Tr. Vol. I at 15.) Additionally, Detective Orick testified that when he met with K.C. after receiving K.C.'s letter, K.C. told him again that the threats were coming from Dillion through other members of Dillion's gang.

{¶ 44} In addition to K.C.'s express statements both in his letter and to Detective Orick that Dillion was orchestrating the threats to K.C.'s family, the other evidence at the hearing supported the conclusion, by a preponderance of the evidence, that Dillion intentionally procured K.C.'s unavailability with the purpose of preventing him from testifying. The state disclosed K.C.'s interview during discovery in a filing dated December 18, 2018. Subsequently, K.C.'s family home was shot in April 2019. In 2021, as the matter moved closer to trial, the threats escalated to a point that K.C. refused to cooperate. Additionally, Dillion had a copy of the transcript of K.C.'s statement to police in his jail cell that had been marked up and highlighted. From all this evidence, we find it is a rational inference that Dillion was involved in directing the threats to K.C.'s family with the purpose of preventing K.C. from testifying.

{¶ 45} Nonetheless, Dillion insists the state did not present enough evidence to demonstrate a link between him and the threats. We are mindful, however, that the doctrine of forfeiture by wrongdoing requires the state to prove the doctrine's applicability only by a preponderance of the evidence. *Bias* at ¶ 59. Unlike more stringent evidentiary standards such as clear and convincing evidence or evidence beyond a reasonable doubt, the preponderance of the evidence requires only that the existence of a fact be more likely than not. *See, e.g., State v. Gwynne*, __ Ohio St.3d __, 2022-Ohio-4607, ¶ 23 (while preponderance of the evidence is a "more-likely-than-not standard," clear and convincing evidence "imposes a higher evidentiary standard" of a firm belief or conviction). In accordance with the preponderance of the evidence standard, we find it was more likely than not that Dillion participated in procuring K.C.'s absence with the purpose of

preventing K.C.'s testimony. Accordingly, the trial court did not err in applying the forfeiture by wrongdoing exception to the Confrontation Clause and to the hearsay rule and admitting K.C.'s recorded interviews with police. We overrule Dillion's first assignment of error.

## IV. Second Assignment of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 46} In his second and final assignment of error, Dillion argues there was insufficient evidence to support his convictions of aggravated burglary, aggravated robbery, aggravated murder, murder, felonious assault, and the accompanying firearm specifications and that those convictions are against the manifest weight of the evidence. Dillion does not present any argument related to the sufficiency or manifest weight of the evidence of his tampering with evidence conviction, having a weapon while under disability conviction, or the gang specifications.

### A. Sufficiency of the Evidence

{¶ 47} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 48} As relevant to this appeal, the jury convicted Dillion of one count of aggravated burglary, one count of aggravated robbery, three counts of aggravated murder, two counts of murder, and one count of felonious assault, as well as the accompanying firearm specification attached to each offense. We must examine each count to determine whether the state presented sufficient evidence to prove the essential elements of each count beyond a reasonable doubt.

### 1. Aggravated Burglary

{¶ 49} Dillion was convicted of aggravated burglary. Pursuant to R.C. 2911.11(A)(1) and (2), "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose

to commit in the structure * * * any criminal offense" if either "[t]he offender inflicts, or attempts or threatens to inflict physical harm on another," or "[t]he offender has a deadly weapon or dangerous ordinance on or about the offender's person or under the offender's control." The culpable mental state for aggravated burglary is "purposeful." *Fry*, 2010-Ohio-1017, at ¶ 44, citing *State v. Conley*, 4th Dist. No. 08CA784, 2009-Ohio-1848, ¶ 40.

{¶ 50} Dillion asserts there was no evidence presented at trial that he either trespassed into an occupied structure with the purpose to commit a criminal offense or that he had a deadly weapon under his control. We disagree. A.R. testified that Dillion, Wade, and D.W. approached Williams' residence with the plan to steal marijuana from him, and she further testified that Dillion told her once he was back in the car that he shot Jones-Mattox. Additionally, Williams' neighbor across the street testified that a man inside the residence shot Jones-Mattox as she was trying to climb out of a window. Thus, the state presented sufficient evidence to support Dillion's conviction of aggravated burglary.

### 2. Aggravated Robbery

{¶ 51} Dillion was also convicted of aggravated robbery. Pursuant to R.C. 2911.01(A), a person is guilty of aggravated robbery if the person in attempting to commit a theft offense, as defined in R.C. 2913.01, or in fleeing immediately after the attempt or offense, either inflicted, or attempted to inflict, serious physical harm on another, or had a deadly weapon on or about the offender's person or under the offender's control and displayed the weapon, brandished it, indicated that the offender possessed it, or used it. R.C. 2911.01(A)(1) and (3). A "theft offense," pursuant to R.C. 2913.01(K), includes violations of R.C. 2911.02, robbery, and 2913.02, theft. Theft requires the state to prove beyond a reasonable doubt that the defendant, with the purpose to deprive the owner of property, knowingly obtained control over the property without the consent of the owner or through deception, threat, or intimidation. R.C. 2913.02. A person acts with a particular purpose when "it is [his] specific intention to cause a certain result." R.C. 2901.22(A).

{¶ 52} Dillion asserts there was no evidence at trial demonstrating he attempted or committed a theft offense. However, as noted above, A.R. testified that Dillion, Wade, and D.W. planned to steal drugs from Williams, and she further testified that Dillion and Wade returned to her vehicle with Williams' gun. A.R. testified that Dillion admitted to shooting

Jones-Mattox before he fled. Thus, the state presented sufficient evidence to support Dillion's conviction of aggravated robbery.

### 3. Aggravated Murder

{¶ 53} Dillion was convicted of one count of aggravated murder under R.C. 2903.01(A) related to Jones-Mattox and two counts of aggravated murder under R.C. 2903.01(B) related to both Jones-Mattox and Williams. Pursuant to R.C. 2903.01(A), "[n]o person shall purposely, and with prior calculation and design, cause the death of another." Under R.C. 2903.01(B), "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit" certain offenses including aggravated robbery and aggravated burglary.

{¶ 54} Dillion asserts there was no eyewitness evidence presented at trial that he shot any particular individual or that he ever fired a gun. However, A.R. testified she watched Dillion, Wade, and D.W. go up to Williams' house, that Dillion returned holding a gun, and that Dillion told her Wade shot Williams and Dillion shot Jones-Mattox. Standing alone, evidence of a defendant's admission to the commission of the offense, when viewed in a light most favorable to the prosecution, is sufficient evidence to prove the elements of the offense beyond a reasonable doubt. *McKelton*, 2016-Ohio-5735, at ¶ 327; *see also State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 24 (sufficient evidence to support appellant's convictions of murder, kidnapping, aggravated robbery, and aggravated burglary where several witnesses testified that appellant admitted to shooting the victim as he was leaving the scene). Thus, there was sufficient evidence to support Dillion's conviction of aggravated murder of Jones-Mattox under R.C. 2903.01(B).

{¶ 55} With respect to Williams, the evidence was sufficient to convict Dillion of aggravated murder as an aider and abettor. Under R.C. 2923.03(A)(2), "complicity" is defined as "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." To support a conviction for complicity, pursuant to R.C. 2923.03(A)(2), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, syllabus. A.R.

testified that Dillion, Wade, and D.W. approached the residence with the plan of robbing Williams, and she further testified that Dillion told her Wade shot Williams while Dillion shot Jones-Mattox. Additionally, K.C. told police that Dillion admitted the group's plan all along was to kill Williams and anyone else in the house. Thus, we do not agree with Dillion that the state failed to present sufficient evidence related to his aggravated murder conviction for Williams' death.

{¶ 56} Additionally, with respect to the conviction under R.C. 2903.01(A), Dillion asserts there is no evidence that he acted with prior calculation and design to cause Jones-Mattox's death. "Proof of 'prior calculation and design' requires proof of 'a scheme designed to implement the calculated decision to kill.' " *State v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, ¶ 60, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978). "The amount of care or time that the defendant spends in planning and analyzing the crime are not critical factors in themselves; however, they must amount to more than momentary deliberation." (Internal quotations and citations omitted). *Id*.

{¶ 57} In determining whether there is legally sufficient evidence to prove prior calculation and design, a court considers three factors: (1) whether the accused and the victim knew each other and, if so, whether that relationship was strained; (2) whether the accused gave thought or preparation to choosing the murder weapon or murder site; and (3) whether the act was drawn out or was " 'an almost instantaneous eruption of events.' " *Hundley* at ¶ 61, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997). The Supreme Court has " 'never set forth a bright-line test for discerning the presence or absence of prior calculation and design but instead [directs appellate courts to] undertake[ ] a unique analysis of the facts of each case.' " *Hundley* at ¶ 61, quoting *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 56.

{¶ 58} Here, A.R. testified that Dillion and his associates knew Williams. Additionally, A.R. testified that Dillion and the associates planned to rob Williams, indicating some strain in the relationship. Further, A.R. testified that she drove Dillion, Wade, and D.W. around while they came up with their plan to rob Williams. Dillion told A.R. when the group approached Williams' house, D.W. already had his gun cocked but it jammed when he tried to fire it, indicating the use of deadly force was part of the plan. Moreover, K.C. told police that Dillion admitted the group planned to rob and kill Williams

and then kill everyone in the house so they would not leave any potential witnesses alive. After Wade shot Williams, Dillion heard Jones-Mattox trying to escape and had sufficient time and opportunity to decide to shoot Jones-Mattox in furtherance of their plan to eliminate any witnesses.

{¶ 59} To the extent Dillion asserts the evidence of prior calculation and design applied only to the murder of Williams and not to Jones-Mattox, we note that the Supreme Court has repeatedly held that the doctrine of transferred intent encompasses the transfer of prior calculation and design in an aggravated murder case. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 136 (stating "[t]he doctrine of transferred intent is firmly rooted in Ohio law," and noting transferred intent applies in aggravated murder cases); *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 171; *State v. Sowell*, 39 Ohio St.3d 322, 331 (1988) (rejecting the defendant's argument that his indictment was defective for alleging prior calculation and design where the defendant admitted to having a prior calculation and design to kill one person but "[i]n his attempt to carry out his design, [the defendant] purposely and intentionally killed" a different person). " '[I]f one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder in violation of R.C. 2903.01(A).' " *Sowell* at 330, quoting *State v. Solomon*, 66 Ohio St.2d 214, 218 (1981) ("[as] with premeditation, the culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the actual victim"). Thus, when viewed in a light most favorable to the prosecution, the evidence at trial was sufficient to support a finding of prior calculation and design with respect to Jones-Mattox.

{¶ 60} For these reasons, the state presented sufficient evidence to support all three of Dillion's convictions of aggravated murder.

### 4. Murder

{¶ 61} The jury also convicted Dillion of two counts of murder pursuant to R.C. 2903.02(B), also known as felony murder. In order to convict a defendant of felony murder, in violation of R.C. 2903.02(B), the state must prove the defendant caused the death of another "as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a

violation of section 2903.03 or 2903.04 of the Revised Code."  Aggravated robbery is an offense of violence.  R.C. 2901.01(A)(9)(a).

{¶ 62} Dillion reiterates his argument made related to his aggravated murder convictions that because there was no eyewitness testimony demonstrating he killed anyone, the state presented insufficient evidence to convict him of felony murder. However, for the same reasons we articulated in our discussion of Dillion's aggravated murder convictions, A.R.'s testimony that Dillion told her that he shot Jones-Mattox and Wade shot Williams during the aggravated robbery was sufficient evidence to convict him of felony murder both as a principal offender as to Jones-Mattox and under a complicity theory as to Williams.

### 5. Felonious Assault

{¶ 63} The jury additionally convicted Dillion of one count of felonious assault related to Jones-Mattox.  Under R.C. 2903.11(A), no person shall knowingly cause serious physical harm to another or cause, or attempt to cause, physical harm to another by means of a deadly weapon.  Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of [his] purpose, when [he] is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature."  Evidence that a defendant fired a gun in the direction of the victim is sufficient evidence that the defendant acted knowingly for purposes of a conviction of felonious assault.  *State v. Fox*, 10th Dist. No. 17AP-295, 2018-Ohio-501, ¶ 14.

{¶ 64} Dillion again argues there was insufficient evidence to support his conviction because the state did not present eyewitness testimony that he caused physical harm to Jones-Mattox by means of a deadly weapon.  We again reject that argument as Dillion admitted to A.R. that he shot Jones-Mattox.  We find there was sufficient evidence to support Dillion's conviction of felonious assault.

### 6. Firearm Specification

{¶ 65} Finally, under his sufficiency of the evidence argument, Dillion asserts there was insufficient evidence to convict him of the gun specification attached to each of the offenses.  To prove a gun specification under R.C. 2941.145, the state must show that the defendant had a firearm on or about his person or under his control while committing the charged offense and that he displayed, brandished, or indicated that he possessed the firearm, or used the firearm to facilitate the offense.

{¶ 66} Once again, Dillion premises his argument on the lack of an eyewitness who saw him with a firearm during the commission of the offenses. We again reject this argument and find that A.R.'s testimony related to Dillion's admission to participating in the offenses, including his admission that he shot Jones-Mattox and that he was carrying a gun when he returned to A.R.'s car, is sufficient evidence to support the attendant firearm specifications.

**B. Manifest Weight of the Evidence**

{¶ 67} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient, competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins*, 78 Ohio St.3d at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 68} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 69} Dillion argues his convictions are against the manifest weight of the evidence on the general grounds that the state did not present eyewitness testimony of his

involvement. However, as we noted above, eyewitness testimony is not required. Moreover, the testimony of A.R. and K.C. provided overwhelming evidence of Dillion's guilt. Dillion does not suggest that their testimony lacked credibility to such a degree that his convictions are against the manifest weight of the evidence. *See*, *e.g.*, *State v. Webster*, 10th Dist. No. 20AP-171, 2021-Ohio-3218, ¶ 74 (it is within the province of the jury to believe a witnesses' testimony despite his or her admitted involvement in the offenses and plea agreement with the state), citing *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18 (noting the jury is in the best position to assess the credibility of a co-defendant). A.R. and K.C. both provided similar accounts of Dillion's involvement in the offenses, and A.R.'s testimony was further corroborated by the surveillance footage and by the recovery of the firearms in the locations that A.R. told police Dillion and Wade tried to dispose them. Considering all the evidence, we cannot say the jury lost its way in believing the testimony of A.R. and K.C.

{¶ 70} Thus, in light of the evidence discussed above, as well as the record in its entirety, we find the jury did not clearly lose its way in finding Dillion guilty of aggravated burglary, aggravated robbery, aggravated murder, murder, felonious assault, and the attendant firearm specifications. After an independent review of the record, we find sufficient evidence to support Dillion's convictions, and Dillion's convictions are not against the manifest weight of the evidence. We, therefore, overrule Dillion's second and final assignment of error.

## V. Disposition

{¶ 71} Based on the foregoing reasons, the trial court did not err in admitting the testimony of an unavailable witness under the doctrine of forfeiture by wrongdoing. Additionally, sufficient evidence and the manifest weight of the evidence support Dillion's convictions of aggravated burglary, aggravated robbery, aggravated murder, murder, felonious assault, and the attendant firearm specifications. Having overruled Dillion's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS and EDELSTEIN, JJ., concur.