[Cite as *State v. Taylor*, 2023-Ohio-1766.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29443 |
| | : | |
| v. | : | Trial Court Case No. 2019 CR 02787/2 |
| | : | |
| WILLIAM TAYLOR | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 26, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

ROBERT ALAN BRENNER, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, William Taylor, appeals from his convictions on numerous charges, including aggravated robbery, kidnapping, felonious assault, aggravated burglary, and felonious assault on a police officer. According to Taylor, his convictions on some counts were not supported by sufficient evidence because the State failed to prove that he used deadly force and that two victims suffered serious physical

harm. Taylor further contends that some convictions must be reversed because the jury verdict forms only specified that he had caused "serious harm" rather than "serious physical harm." In addition, Taylor asserts that the trial court erred in imposing consecutive sentences and in imposing financial sanctions and court costs.

{¶ 2} After reviewing the record, we conclude that Taylor's felonious assault convictions were supported by sufficient evidence because the State established that he had used deadly force and that his victims had suffered serious physical harm. The trial court did not err in captioning the jury verdict forms with the words "serious harm" rather than "serious physical harm." Using captions to identify offenses is a rational way to identify the verdict for each offense, particularly where, as here, many offenses were involved.

{¶ 3} The State concedes that the trial court erred in calculating the proper sentence under the Reagan Tokes Law, and we agree. However, the trial court did not err in imposing consecutive sentences, which originally resulted in a 94.5-year maximum prison term. Under *State v. Gwynne*, Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __, a trial court must consider each sentence on individual counts that it intends to impose consecutively on the defendant and the aggregate prison term that will result. Nonetheless, we are unable to reach a firm conviction or belief that "the record does not support the trial court's necessity or proportionality findings in light of the actual number of consecutive terms that it imposed and the resulting aggregate sentence." *Gwynne* at ¶ 17.

{¶ 4} We further conclude that the court did not err in ordering Taylor to pay

restitution. Taylor failed to object to the amount or to ask for a hearing in the trial court, the trial court did consider Taylor's ability to pay, and the amount of restitution was minimal. Finally, no error occurred in imposing court costs, because Taylor failed to file a motion in the trial court seeking waiver of court costs based on his alleged indigent status. Taylor has also not lost his ability to make such a request, since R.C. 2947.23(C) allows defendants to make such requests at the time of sentencing or at any time thereafter.

{¶ 5} Accordingly, the judgment of the trial court will be affirmed in part and reversed in part as to the error in calculating the sentence under the Reagan Tokes Law. This matter will be remanded so that the trial court may correct the sentence.

## I. Facts and Course of Proceedings

{¶ 6} The charges against Taylor arose from a series of events that began in the late evening hours of August 20, 2019, and continued into August 21, 2019. Essentially, Taylor and another individual, Aaron Paddock, assaulted and robbed a pedestrian, attempted to break into one house, assaulted the resident of that house when he came outside, and then broke into a second home. Taylor damaged property in that house before fleeing. In the process of attempting to flee, Taylor also assaulted and injured several police officers.

{¶ 7} On August 30, 2019, an indictment was filed charging Taylor with 12 counts, including: (1) aggravated robbery (serious harm), a first-degree felony; (2) kidnapping (terrorize/physical harm); a first-degree felony; (3) felonious assault (serious harm), a

second-degree felony; (4) felonious assault (serious harm), a second-degree felony; (5) felonious assault (deadly weapon), a second-degree felony; (6) criminal damaging, a second-degree misdemeanor; (7) aggravated burglary (physical harm), a first-degree felony; (8) felonious assault (police officer) (deadly weapon), a first-degree felony; (9) felonious assault (police officer) (deadly weapon), a first-degree felony; (10) assault (police officer), a fourth-degree felony; (11) assault (police officer), a fourth-degree felony; and (12) assault (police officer), a fourth-degree felony. Eight charges had repeat violent offender specifications. The offense supporting the specifications was that Taylor had previously been convicted of or had pled guilty to burglary in Greene County C.P. No. 2014 CR 226.

{¶ 8} On September 5, 2019, Taylor pled not guilty to the charges, and counsel was appointed to represent him. Trial was initially set for November 18, 2019, but Taylor filed a written waiver of his speedy trial rights on November 14, 2019. Subsequently, on March 10, 2020, Taylor entered a written plea of not guilty by reason of insanity and asked the court to order a competency evaluation. On March 12, 2020, the court issued an order for an evaluation. The report was submitted on April 3, 2020, and the court then, on May 12, 2020, ordered a second competency evaluation at Taylor's request. The docket does not include a decision finding Taylor competent, but the presentence investigation report ("PSI") indicates that both psychiatrists found Taylor competent. PSI, p. 8.

{¶ 9} After a number of continuances, the case was ultimately tried to a jury beginning on February 28, 2022. At the end of the trial, the jury found Taylor guilty of all

counts and specifications as charged. On March 7, 2022, Taylor filed a motion for acquittal on all charges, alleging that the verdicts were against the manifest weight of evidence. However, the trial court overruled the motion on March 23, 2022.

{¶ 10} During the sentencing hearing, the court merged the following counts: I and III; IV and V; VIII and X; and IX and XI. For these merged counts, the State elected for the court to impose sentencing on Counts I, IV, VIII, and IX. Except as to Count II, on which Taylor was found to be a repeat violent offender, the State asked to dismiss the repeat violent offender specifications, and the court dismissed them. Some sentences were imposed consecutively and two were imposed concurrently, for a total prison term of a minimum of 63 years to a maximum of 94.5 years. The court also imposed restitution of $135 and ordered Taylor to pay court costs. Taylor timely appealed from the judgment of conviction.

## II. Sufficiency of the Evidence

{¶ 11} Taylor's first assignment of error states that:

There was Insufficient Evidence Presented to Support the Convictions in Counts V, VIII, IX, I, III, IV, and II.

{¶ 12} Under this assignment of error, Taylor makes two arguments. First, he contends that his convictions on Counts V, VIII, and IX were based on insufficient evidence because the State failed to prove that he used a deadly weapon. Second, Taylor argues that Counts I, III, and IV were based on insufficient evidence because the

State failed to prove that the victims suffered serious physical harm.[1]  We will discuss these issues separately after outlining applicable standards for evaluating sufficiency of the evidence.

A.  Sufficiency Standards

{¶ 13} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."  *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).  In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶ 14} Furthermore, "[b]ecause the factfinder * * * has the opportunity to see and

---

[1] Taylor included Count II in his statement of this assignment of error but made no argument about it in his brief.  Count II asserted a kidnapping charge in connection with victim C.L.  Because no argument was made about Count II, we will not discuss it.

hear the witnesses, * * * [t]he decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 15} Contrastingly, deciding "which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." *Id.* "Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, no matter how persuasive the evidence may be." *State v. Brooks*, 2d Dist. Montgomery No. 21531, 2007-Ohio-1029, ¶ 28, citing *Lawson* at *4.

### B. Serious Physical Harm

{¶ 16} As noted, Taylor maintains that the State failed to prove, for purposes of Counts V, VIII, and IX, that he possessed a deadly weapon, and for purposes of Courts I, III, and IV, that he caused the victims serious physical harm. The "serious physical harm" argument includes charges involving the first victim. For purposes of chronological continuity, we will consider the physical harm argument first.

### (1) Victim C.L. (Counts I and III)

{¶ 17} Count I of the indictment alleged that between the dates of August 20, 2019 through August 21, 2019, Taylor, while "attempting or committing a theft offense as

defined in R.C. 2913.01(K) * * * or in fleeing immediately thereafter the attempt or offense, did inflict serious physical harm on * * * [C.L.] * * * in violation of" R.C. 2911.01(A)(3). Count III, which was merged with Count I, further charged that on the same dates, Taylor knowingly caused "serious physical harm" to C.L. in violation of R.C. 2903.11(A)(1).

{¶ 18} The statute in Count I, R.C. 2911.01, describes the crime of aggravated robbery. This statute, as pertinent here, states that:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 19} The statute involved in Count III, R.C. 2903.11, describes the crime of felonious assault. As relevant here, this statute provides that: "(A) No person shall knowingly * * * : (1) Cause serious physical harm to another or to another's unborn."

{¶ 20} At the time of the crimes, R.C. 2901.01(A)(5) stated that:

"Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.[2]

{¶ 21} The only challenged element here is whether C.L. suffered "serious physical harm." Construing the facts in the State's favor, as required, the evidence concerning the crime committed against C.L. was as follows.

{¶ 22} On August 20, 2019, Aaron Paddock was 18 years old and lived in Dayton, Ohio. Transcript of Proceedings ("Tr."), p. 334 and 336. At the time, Paddock was doing various odd jobs like construction and selling narcotics. *Id.* at p. 336-337. On August 20, Paddock had helped a man tear apart a house and had been paid in methamphetamine ("meth"). *Id.* at p. 337. Paddock was given some shards of meth at around 9:00 p.m. He put them in a tin and was going to sell the meth. Paddock took a bus to the downtown Dayton bus hub, arriving around 10:00 p.m., and then walked east on Third Street. *Id.* at p. 338-339.

{¶ 23} While Paddock was walking down Third Street, he met a man who identified himself by the nickname of "G5"; Paddock later discovered that the man's name was William Taylor. *Id.* at p. 339-340. Paddock and Taylor each thought the other looked familiar, and they discovered that Taylor was from a street close to where Paddock grew

---

[2] We note that R.C. 2901.01 was recently amended, with the effective date of the amendments being April 3, 2023. However, the definition of serious physical harm was not changed. *See* Am. Sub.S.B. 288, 2022 Ohio Laws 160.

up. Paddock told Taylor he was planning to sell drugs, and Taylor said something about having gotten out of a jail and that he was "f***ed up." Paddock told Taylor to come along with him to help sell the drugs and that he would give Taylor some of the money. *Id.* at p. 340-341. The two men then began walking toward the east side of town where Paddock had previously made a few drug distributions late at night. *Id.* at p. 342.

{¶ 24} During their walk, Paddock and Taylor bought drinks at a Sunoco station and encountered C.L., who was walking along the street. *Id.* at p. 342-343 and 350-351. At the time, Paddock and Taylor were intoxicated from doing meth, and Taylor had mentioned finding someone to rob. *Id.* at p. 345-346.

{¶ 25} C.L. was employed at Milano's on Brown Street in Dayton, Ohio. C.L. had worked that day from 9:00 a.m. to 3:00 p.m., and from 5:00 p.m. to 12:30 a.m. Tr. at p. 131-132. At the time of the incident, C.L. was walking home from Milano's to his house on East 4th Street. C.L. was dressed in his Milano's shirt, a pair of pants, and a black tank top. He had on headphones and also had a cell phone, house keys, and time slips. *Id.* at p. 133. On his typical route home, C.L. would pass the Sunoco station. After he did so that night, he encountered two people (Paddock and Taylor). *Id.* at p. 133-134 and 350-351. They asked him if he wanted to "buy boy, girl, or ice." *Id.* at p. 134. C.L. thought he knew what those terms meant (one was heroin, one was coke, and one was meth). He told them he did not do drugs. *Id.* at p. 134-135.

{¶ 26} C.L. continued to walk, and the two men said they would walk with him to make sure he got home because they did not trust the streets. They proceeded to walk by a big open field, and the two men then attacked C.L. *Id.* C.L. had on a pair of nice

headphones, and Taylor wanted them. Taylor had offered to buy them, but C.L. said they were not for sale. *Id.* at p. 351. At that point, Taylor turned to Paddock and said, "We're going to rob him." *Id.* at p. 352. Paddock agreed, and Taylor turned around and grabbed the headphones. Paddock then punched C.L. on the side with a closed fist, and C.L. fell over. *Id.*

{¶ 27} Paddock punched C.L. a few more times, and then Taylor began "stomping" C.L. anywhere his foot could reach. *Id.* at p. 352-353. C.L. said, "please stop," but they did not stop. Taylor then dragged C.L. by his leg and on his back deeper into the grassy area. Taylor started stripping C.L. naked, asking him "where's the money," and one of the men said something about killing C.L. *Id.* at p. 135 and 353. After C.L. was naked, the beating still did not stop. *Id.* at p. 354. C.L. was in fear of his life and was still pleading for it to stop, but Taylor did not stop. *Id.* at p. 354-355. Taylor also took a lighter out of his pocket and tried to burn C.L.'s face. *Id.* at p. 355.

{¶ 28} At some point, C.L. tried to run away, and he was thrown up against a fence. Tr. at p. 136. Eventually, C.L. managed to escape, and they did not chase him. *Id.* at p. 356. C.L. ran to the doors of the Circle K (a convenience store) but was not able to get help there. He then ran naked down McReynolds Street, where he was able to obtain help from people at a house on that street. *Id.* at p. 136-137 and 142.

{¶ 29} C.L. was transported to Miami Valley Hospital, where he was treated and then released around 8:00 a.m. *Id.* at p. 137. C.L. had a nasal fracture, with the bone in multiple pieces, and scratches and bruises on his head, back, shoulder, arm, and side. *Id.* at p. 138-141 and 236-237. The doctors also had to drain hematomas from C.L.'s

ears to prevent disfigurement. *Id.* at p. 235-236. A loss of consciousness was also reported. *Id.* at p. 237-238. C.L. had pain for a month or two and, at the time of trial, still had swelling on the side of his face when he sneezed. *Id.* at p. 137-138.

{¶ 30} The police officer who spoke with C.L. at the hospital described him as having been "severely beaten." *Id.* at p. 166. C.L. had injuries, his eye orbitals were different sizes, his eyes were swollen at different levels, and his ears were bleeding. *Id.*

{¶ 31} Given C.L.'s injuries, we find sufficient evidence of serious physical harm. We have previously held that broken bones constitute serious physical harm for purposes of the statute. *See State v. Boyd*, 2d Dist. Montgomery No. 11659, 1990 WL 78595, *4 (June 5, 1990) (broken arm); *State v. Brown*, 2d Dist. Montgomery No. 27738, 2018-Ohio-3068, ¶ 30 (broken bones in left arm and wrist, abrasions and severe bleeding); *State v. Gibson*, 2d Dist. Greene No. 2009-CA-05, 2010-Ohio-1121, ¶ 8 (broken nose that still caused problems at time of trial). Here, there was more than just a broken bone. C.L. had significant injuries.

{¶ 32} Accordingly, sufficient evidence supported Taylor's conviction on Counts I and III. We will now consider whether the victim in Count IV suffered serious physical harm.

### 2) Victim E.G. (Count IV)

{¶ 33} Count IV of the indictment deals with victim E.G. and states that, between the dates of August 20, 2019 through August 21, 2019, Taylor "did knowingly cause serious physical harm to * * * [E.G.] * * * in violation of" R.C. 2903.11(A)(1). Again, this

crime is felonious assault, and the definition of "serious physical harm" is the same. The facts relevant to E.G.'s physical harm were as follows.

{¶ 34} After leaving C.L., Taylor and Paddock walked around and then, according to Paddock, Taylor sexually molested him for a couple of hours. Tr. at p. 356 and 357-358. At one point, a dog walked by and Taylor told Paddock to get the dog, kill it, and bring it back to him. *Id.* at 359. Paddock saw an opportunity to get up and run, so he "went after the dog." *Id.* Paddock then saw Taylor running toward him, so he stopped chasing the dog. At that point, Taylor said they were going to find something else to do. *Id.* at p. 360.

{¶ 35} By this time, Paddock had no shirt on, and Taylor's pants were off; Taylor did not have on any undergarments, so he was naked other than his shirt. *Id.* at p. 359-360. From that time on, Taylor was not wearing any pants. *Id.* at p. 360.

{¶ 36} On the night in question, E.G. lived on McLain Street in Dayton, Ohio. *Id.* at p. 205-206. Between 2:00 a.m. and 3:00 a.m., E.G. woke up because someone had thrown a stick through his window. He heard two individuals yelling between themselves, and he thought they wanted to gain access to his house. However, when he looked out, they were trying to get into his car. *Id.* at p. 207. E.G. went to the door and asked them what they were doing; at that point, they took a chair from the porch and broke through a window. *Id.* at p. 209. E.G. called the police because the house was being damaged, and he exited the house to confront the men. *Id.* at p. 213. Paddock had a two-by-four board in his hands and started hitting E.G. in the head with the board. *Id.* at p. 214 and 361.

{¶ 37} E.G.'s head was bleeding, and he was also hit on his shoulder and ribs. *Id.* at p. 214-215. Both men were attacking him. *Id.* at p. 216. The attack only stopped because E.G. was yelling loudly for help, and neighbors across the street were walking out on their front porches with cell phones. *Id.* at p. 362. At that point, Taylor and Paddock began running and ended up on Boltin Street. *Id.* at p. 362.

{¶ 38} E.G. was taken to the hospital and had a four-centimeter laceration on the top of his head, with some surrounding swelling. *Id.* at p. 217-219 and 247. E.G. was given a CAT scan to make sure there was no injury inside the brain, and three staples were placed to stop the bleeding and close the laceration. *Id.* at p. 247-248. This was the type of injury that would cause scarring and would be painful to the patient. *Id.* at p. 248. After being released from the hospital, E.G. was on pain medication and had headaches. At the time of trial, E.G. sometimes still suffered from headaches. *Id.* at p. 220-221.

{¶ 39} Again, we find sufficient evidence of serious physical harm. *See State v. Reckers*, 1st Dist. Hamilton No. C-060451, 2007-Ohio-3679, ¶ 16 (cuts and abrasions, and injury requiring staples and leaving scar were serious physical harm); *State v. Crossty*, 2017-Ohio-8382, 99 N.E.3d 1048, ¶ 22 (1st Dist.) ("[w]here wounds require stitches or staples or other manner of medical treatment to close them, courts have found sufficient evidence of serious physical harm"); *State v. Carter*, 6th Dist. Lucas No. L-18-1037, 2019-Ohio-2046, ¶ 11 ("Ohio courts have held that serious physical harm is present when the victim suffers cuts to the head that require stitches").

{¶ 40} Our court has stressed that "[w]hether a person commits a robbery or an

aggravated robbery is not determined by the condition in which the victim ultimately finds himself. Rather, it turns on the nature of the assailant's actions and the *potential* for serious physical harm to the victim." (Emphasis sic.) *State v. Mcguire*, 2d Dist. Montgomery No. 11443, 1989 WL 159206, *3 (Dec. 27, 1989). Certainly, hitting a person in the head with a two-by-four has the potential for creating serious physical harm, and it did cause such harm here.

**{¶ 41}** E.G. suffered a wound that required three staples, took medication, and had headaches both at the time and continuing thereafter. Thus, sufficient evidence of serious physical harm existed.

### C. Deadly Weapon

**{¶ 42}** As noted, under the first assignment of error, Taylor also argues that Counts V, VIII, and IX were based on insufficient evidence because the State failed to prove that he used a deadly weapon. Again, we will consider this issue in the context of the particular person or incident that was involved.

### 1. Victim E.G. (Count V)

**{¶ 43}** Count V of the indictment states that between August 20, 2019 and August 21, 2019, Taylor "did knowingly cause or attempt to cause physical harm to * * * [E.G.], by means of a deadly weapon or dangerous ordinance" in violation of R.C. 2903.11(A)(2). Taylor acknowledges testimony that E.G. was hit with a "two-by-four" but claims the State failed to present any evidence that this object was capable of causing death. Appellant's

Brief, p. 7-8. We disagree.

{¶ 44} R.C. 2903.11 outlines the elements of the crime of felonious assault. As pertinent here, the statute says that:

> (A) No person shall knowingly do either of the following:
>
> * * *
>
> (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

{¶ 45} Further, R.C. 2903.11(E) incorporates the definition of "deadly weapon" in R.C. 2923.11. Under that statute, a deadly weapon is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).

{¶ 46} "Committee comment on this generic definition points out that a deadly weapon is anything capable of causing death and is carried, possessed on [sic] used as a weapon such as a rock or cane when used for offensive or defensive purposes." *State v. Clark*, 2d Dist. Clark No. 1298, 1979 WL 208322, *1 (May 23, 1979). *Accord State v. Portis*, 2d Dist. Montgomery No. 28677, 2021-Ohio-608, ¶ 39. "Illustrations of things, innocent in themselves, that may be capable to causing death include a baseball bat, a Coke bottle, a toy pistol and an unloaded gun. The statute is not limited to instruments that are dangerous or deadly per se, but includes anything that may be possessed that has an actual or potential danger of serious or deadly harm under the circumstances encountered in a theft offense such as robbery." *Clark* at *1.

{¶ 47} "In other words, '[t]he definition of deadly weapon in R.C. 2923.11(A)

imposes two requirements of proof. First, the article must be capable of inflicting death. Second, the article must either (1) have been designed or specially adapted for use as a weapon or (2) possessed, carried, or used as a weapon. When use is a factor, the manner of its use and the nature of the instrument itself determines its capacity to inflict death.' " *Portis* at ¶ 39, quoting *State v. Schooler*, 2d Dist. Montgomery No. 19627, 2003-Ohio-6248, ¶ 21.

{¶ 48} As an additional matter, "expert testimony is not required to establish that an instrumentality is capable of causing death." *Id.* at ¶ 40, citing *State v. Coney*, 10th Dist. Franklin No. 94APA05-670, 1995 WL 65013, *4 (Feb. 16, 1995). Instead, "[c]ommon sense and experience" of * * * [jurors] observing the instrument" in a defendant's hands, "under the circumstances as presented * * * dictate the appropriate finding." *Coney* at *4. *Accord Portis* at ¶ 40.

{¶ 49} Construing the evidence in the State's favor, as required, there was more than sufficient evidence to indicate that the two-by-four used to attack E.G. was a deadly weapon. If a cane or baseball bat could be a deadly weapon, so could a board in the circumstances presented here. Accordingly, Taylor's argument about E.G. is without merit.

2. Victims Officer Staples (Count VIII) and Officer Olinger (Count IX)

{¶ 50} We will discuss these two counts together, as the facts are interrelated. Count VIII alleges that at the time in question, Taylor "did knowingly cause or attempt to cause physical harm to Officer Staples, * * * by means of a deadly weapon or dangerous

ordnance," in violation of R.C. 2903.11(A)(2). Count IX makes the same allegations about Taylor's use of a deadly weapon against Officer Olinger. The facts pertinent to these charges are as follows.

{¶ 51} As noted, after assaulting E.G., Taylor and Paddock ran from the scene. They ended up on Boltin Street, which was nearby. They saw a house where the lights were still on but did not enter through the door. Instead, Taylor pushed in an air-conditioning unit, and both men entered that way. Tr. at p. 362-363. There were people inside the room when they broke in. *Id.* at p. 365. However, the people ran upstairs and barricaded themselves in a room. *Id.* At that point, Taylor told Paddock to go after the people, kill them, and bring him their eyeballs. However, Paddock was unable to get into the barricaded room and came back downstairs. *Id.* at p. 366. Taylor then handed Paddock a lamppost and told him to break a window, which he did, using the post like a spear. Paddock sliced his hand in the process and was bleeding profusely. *Id.* at p. 367. By then, Paddock saw police lights and heard an officer say, "Freeze; get on the ground," and Paddock froze. *Id.* at p. 368.

{¶ 52} On August 21, 2019, Dayton Police Officer Shaun Olinger was assigned with the forensic services division and worked throughout the city. *Id.* at 270-271. Around 4:49 a.m., a dispatch came in regarding an address on McLain Street, and Olinger responded at 4:55 a.m. *Id.* at p. 275-276. When Olinger arrived, other officers were on scene. Before Olinger exited his cruiser, an additional call came in about a burglary in process at 43 Boltin Street. Since Olinger was in the approximate area, he responded. *Id.* at p. 276-277. Olinger arrived at the Boltin location within seconds, and no other

cruisers were there.   *Id.* at p. 279.

**{¶ 53}** When Olinger arrived, he could hear glass breaking, so he immediately responded.   He walked over to a broken window and could hear glass breaking and a fight going on inside.   *Id.* at p. 279-280.   He saw two men wrestling on the floor.   One got up with a two-by-four and was about to strike the other.   Olinger had his firearm out but was not sure if one of the people was a homeowner defending himself.   As a result, he yelled and identified himself.   At that point, a two-by-four was thrown out the window at Olinger, striking him in the chest.   *Id.* at p. 280.   Olinger identified Taylor as the person who threw the board at him.   *Id.* at p. 291 and 294.

**{¶ 54}** The other individual in the fight (Paddock) stayed where he was, but Taylor ran off and tried to run out the same window they had come in or another window.   Tr. at p. 284 and 368.   Olinger then ran after Taylor.   In the meantime, other officers had arrived.   *Id.* at p. 285.   One of those officers was Patrol Officer Casey Staples, who had previously met with C.L. in the hospital.   *Id.* at p. 314-315.   Staples was later dispatched to the McLain Street incident but was diverted to Boltin Street because a burglary was in progress at that location.   *Id.* at p. 322.

**{¶ 55}** After exiting her cruiser, Staples made her way toward the house and saw a suspect (that she later identified as Taylor) jump out of the window.   He was not wearing any clothing.   *Id.* at p. 323 and 324-325.   Staples pursued Taylor into an alley behind the house.   When she caught up with Taylor, he reached into a trash pile, grabbed a wooden dog food table, and hit her in the head and left shoulder.   *Id.* at 285-286 and 324.   The dog table also had screws on the bottom.   *Id.* at p. 286-287.   Staples held

onto Taylor until other officers arrived; Olinger was the first. *Id.* at 324.

{¶ 56} It took the effort of several police officers to subdue Taylor; while they were attempting to detain him, Taylor said that either the officers needed to kill him or he would kill them. Taylor was also growling and trying to bite the officers. His behavior was consistent with that of persons who had ingested or were intoxicated on drugs. *Id.* at p. 325 and 290-291. Officer Olinger even tased Taylor twice, but it had no effect. After that, Taylor bit Officer Halley on the outside of his right knee. *Id.* at p. 292-293 and 308. Taylor was eventually subdued after medics arrived and administered medication to calm him down. *Id.* at p. 300.

{¶ 57} Staples subsequently rode in an ambulance to the hospital with Paddock, who had a laceration to his arm. Staples then received treatment because she began to feel dizzy and light-headed and had a headache. Tr. at p. 328-329. Olinger also went to the hospital because he had injured his hand while struggling with Taylor and had been hit by the board. *Id.* at p. 294. In addition, Officer Halley went to the hospital for treatment for his knee. *Id.* at p. 309.

{¶ 58} The same analysis applies to these counts as to Count V. The State provided sufficient evidence that the two-by-four used on Officer Olinger and the wooden dog table used on Officer Staples were deadly weapons. As noted, the statute does not require that items be per se dangerous, but "includes anything that may be possessed that has an *actual or potential danger of serious or deadly harm under the circumstances encountered in a theft offense such as robbery*." (Emphasis added.) *Clark*, 2d Dist. Clark No. 1298, 1979 WL 208322, at *1.

{¶ 59} Because the State provided sufficient evidence of serious physical harm and of use of a deadly weapon, the first assignment of error is overruled.

III.   Jury Verdict Forms

{¶ 60} Taylor's second assignment of error states that:

The Convictions for Counts I, III, and IV Should Be Reversed Because the Jury Did Not Return Verdicts for the Crimes on Which Taylor was Indicted.

{¶ 61} Under this assignment of error, Taylor contends that his convictions on Counts I, III, and IV must be reversed because he was indicted for "serious physical harm" in these counts, but the jury verdicts only found that he caused "serious harm." Appellant's Brief at p. 9.   Taylor fails to cite any authority to support his argument other than a vague reference to due process.   *Id.*   He also does not refer to the record.

{¶ 62} App.R. 16(A)(7) provides, among other things, that an appellant's brief must contain "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Where an appellant fails to support an assignment of error as required by App.R. 16(A)(7), we may disregard the assignment of error.   *State v. Roberts*, 2d Dist. Montgomery No. 18872, 2002 WL 942241, *4 (May 10, 2002), citing App.R. 12(A)(2).   *See also State v. Jones*, 2d Dist. Montgomery No. 27354, 2018-Ohio-2332, ¶ 72 (disregarding several assignments of error due to appellant's failure to comply with App.R. 16(A)(7)).   For this

reason, we disregard this assignment of error.

{¶ 63} However, even if we considered the alleged error, we would review for plain error only, since Taylor failed to object to the verdict forms in the trial court. *See* Tr. at 461-492. *See also State v. Scott*, 2d Dist. Montgomery No. 28139, 2019-Ohio-5014, ¶ 20 (failure to object forfeits all but plain error); *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 17. Under the plain error standard, "the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.' " *Jones* at ¶ 17, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16.

{¶ 64} Having reviewed the record, we find no plain error or even any error. The verdict forms correspond with the last page of the indictment, which had previously labeled Counts I, III, and IV, as involving "serious harm." Notably, this case involved many charges (12), and the labels did not alter the legal requirements that the State was required to prove; the elements of the crimes, in fact, were clearly explained to the jury. *See* Tr. at p. 466-481.

{¶ 65} We have previously said that "[t]here is no requirement that the statutory definition of an offense be included on the verdict form. To the contrary, the inclusion of statutory definitions on a verdict form 'invites confusion and error.' " *State v. Martin*, 2d Dist. Montgomery No. 22744, 2009-Ohio-5303, ¶ 8, quoting *State v. Lampkin*, 116 Ohio App.3d 771, 689 N.E.2d 106 (6th Dist.1996). However, "when a court submits a verdict form containing a statutory description of the offense, it commits reversible error if the

description omits essential elements of that offense." *Lampkin* at 108.

**{¶ 66}** In *State v. Harwell*, 2d Dist. Montgomery No. 25852, 2015-Ohio-2966, we encountered a situation like the one involved here. In that case, we noted that "a review of the jury verdict forms establishes that the forms do not purport to define the offenses or list the elements, but rather merely provide a label to identify the offense on each form." *Id*. at ¶ 60. We stressed that " '[v]erdict captioning is not an improper practice.' " *Id*., quoting *State v. Himes*, 7th Dist. Mahoning No. 08 MA 146, 2009-Ohio-6406, ¶ 31. We further emphasized that "[l]abeling verdict forms is a rational way to identify which verdict is for which offense." *Id*., citing *Himes* and *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 22.

**{¶ 67}** We agree with this description of the labeling process, and it is what occurred here. Accordingly, there is no plain error or even any error based on inclusion of a label to identify the offenses on the verdict forms for Counts I, III, and IV. The second assignment of error, therefore, is overruled.

## IV. Consecutive Sentences

**{¶ 68}** Taylor's third assignment of error states as follows:

The Court Erred When It Ordered Taylor to Serve the Sentences for

Counts I, II, IV, VII, VIII, and IX Consecutively With Each Other.

**{¶ 69}** Under this assignment of error, Taylor contends that the consecutive sentences on Counts I, II, IV, VII, VIII, and IX were not warranted and were disproportionate to the seriousness of his conduct and the danger he poses to the public.

{¶ 70} Before we address this assignment of error, we note that we recently asked both parties to file supplemental briefs addressing two points: (1) whether the trial court erred in calculating Taylor's total sentence under the Reagan Tokes Law; and (2) the effect of the recent Ohio Supreme Court decision in *Gwynne*, Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __, on Taylor's claim that the trial court erred in imposing consecutive sentences. Order (Mar. 15, 2023), p. 1. We did this, in part, because *Gwynne* was issued a day after the State filed its brief in this case. We note that a motion for reconsideration was filed in *Gwynne* on January 3, 2023, and responses were submitted shortly thereafter. However, the court has not yet ruled on the motion. *See* docket for *State v. Gwynne*, Case No. 2021-1033, https://www.supremecourt. ohio.gov/Clerk (accessed on Apr. 28, 2023).

{¶ 71} In any event, Taylor filed his supplemental brief on March 29, 2023, and the State submitted its supplemental brief on April 20, 2023. We will discuss the Reagan Tokes issue first.

A. Reagan Tokes Law

{¶ 72} As indicated, the trial court imposed consecutive sentences on some counts and concurrent sentences on others. These sentences included the following consecutive sentences: Count I (11 to 16.5 years); Count II (11 to 16.5 years); Count IV (8 to 12 years); Count VII (11 to 16.5 years); Count VIII (11 to 16.5 years); and Count IX (11 to 16.5 years). The minimum total for these sentences was 63 years. The court also imposed 60 days of local incarceration on Count VI and 18 months on Count XII,

with these terms to be served concurrently with each other and to the other sentences. The court then added the excess amount of the maximum consecutive sentences (31.5 years) to the minimum amount, to reach a figure of 94.5 years. The court, therefore, imposed a sentence of 63 to 94.5 years. See Tr. at p. 506-508 and Termination Entry (Mar. 25, 2022), p. 2.

{¶ 73} In its supplemental brief, the State concedes that the trial court erred in imposing the maximum sentence under the Reagan Tokes Law. State's Supplemental Brief at p. 1. We agree.

{¶ 74} "Effective March 22, 2019, the Reagan Tokes Law established indefinite-sentencing provisions for people convicted of non-life-sentence felony offenses of the first or second degree. Under R.C. 2967.271(B) through (D), there is a presumption that the offender will be released on the expiration of his or her minimum prison term or earned early-release date, but the statute enables DRC to rebut the presumption and keep the offender incarcerated up to the expiration of his or her maximum prison term." *State v. Maddox*, 168 Ohio St.3d 292, 2022-Ohio-764, 198 N.E.3d 797, ¶ 4.

{¶ 75} The State noted that the trial court had correctly imposed an aggregate minimum 63-year sentence, which included five sentences of 11 to 16.5 years imposed consecutively to each other and one eight to 12-year sentence imposed consecutively to the other sentences. State's Supplemental Brief at p. 1. However, the State concluded that the court had erred in adding all the maximum sentences together to arrive at a total maximum sentence of 94.5 years, when the correct approach was to take the highest range (5.5 years), and add that to the 63-year sentence, for a total aggregate sentence

of 63 to 68.5 years in prison. *Id.*

{¶ 76} The State suggests that the case should be remanded for imposition of the correct sentence under Reagan Tokes, and we agree. *See* R.C. 2929.14(A)(1)(a) and (2)(a) (indicating that maximum terms for first and second-degree felonies committed on or after March 22, 2019, are to be calculated under R.C. 2929.141). *See also* R.C. 2929.141(B)(1) and (2) (both indicating that the "maximum term" shall be equal to the total of the minimum consecutive terms "plus fifty per cent of the longest minimum term or definite term for the most serious felony being sentenced"). In the case before us, that would amount to an additional 5.5 years for the maximum sentence (11 years divided by two equals 5.5 years).

{¶ 77} Accordingly, we will remand the case for correction of this sentencing error. We turn now to the issue of whether other error occurred in the sentencing decision.

### B. Consecutive Sentences

{¶ 78} Defendants can challenge consecutive sentences in two ways. "First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the necessary findings required by R.C. 2929.14(C)(4)." (Emphasis omitted.) *State v. Adams*, 2d Dist. Clark No. 2014-CA-13, 2015-Ohio-1160, ¶ 17, citing R.C. 2953.08(G)(2)(b) and *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29. "Second, the defendant can argue that the record does not support the findings made under R.C. 2929.14(C)(4)." *Id.*, citing R.C. 2953.08(G)(2)(a) and *State v. Moore*, 2014-Ohio-5135, 24 N.E.3d 1197 (8th Dist.). In this case, Taylor does not

assert that the trial court failed to make the findings that R.C. 2929.14(C)(4) requires.

**{¶ 79}** Concerning the second type of challenge, and as relevant here, "R.C. 2953.08(G)(2)(a) compels appellate courts to modify or vacate sentences if they find by clear and convincing evidence that the record does not support any relevant findings under * * * 'division * * * (C)(4) of section 2929.14 * * * of the Revised Code.' " *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22, quoting R.C. 2953.08(G)(2).

**{¶ 80}** " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶ 81}** "R.C. 2929.14(C)(4) is an exception to the presumption in favor of concurrent sentences in R.C. 2929.41(A)." *State v. Withrow*, 2016-Ohio-2884, 64 N.E.3d 553, ¶ 29 (2d Dist.). As pertinent here (according to the trial court's findings), R.C. 2929.14(C)(4) provides that:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness

of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

* * *

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 82} As noted, we asked the parties to file supplemental briefs because the *Gwynne* decision was issued during this appeal. In *Gwynne*, the Supreme Court of Ohio addressed two issues: "1) whether trial courts must consider the overall aggregate prison term to be imposed when making the consecutive-sentence findings under R.C. 2929.14(C)(4) and (2) what the scope of an appellate court's authority is under R.C. 2953.08(G)(2) to review consecutive sentences." *Gwynne*, Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __, at ¶ 1. The court answered that:

We hold that based on the language of R.C. 2929.14(C)(4), the consecutive-sentence findings are not simply threshold findings that, once made, permit any amount of consecutively stacked individual sentences. Rather, these findings must be made in consideration of the aggregate term

to be imposed. Additionally, we hold that appellate review of consecutive sentences under R.C. 2953.08(G)(2) does not require appellate courts to defer to the sentencing court's findings in any manner. Instead, the plain language of the statute requires appellate courts to review the record de novo and decide whether the record clearly and convincingly does not support the consecutive-sentence findings.

*Id.* at ¶ 2.

**{¶ 83}** The decision in *Gwynne* was based on a finding that the statutory language in R.C. 2929.14(C)(4) is ambiguous. *Id.* at ¶ 13. As a result, the court liberally construed R.C. 2929.14(C)(4) and gave it a "more just and reasonable construction." *Id.* at ¶ 17. It therefore concluded that "sentencing courts must consider whether the consecutive terms the court intends to impose are necessary to protect the public and whether those terms are proportionate to the defendant's conduct, *not whether any hypothetical consecutive sentence might be necessary or proportionate.* Accordingly, authority exists for an appellate court to vacate some – but not all – of the consecutive sentences that a trial court has imposed." (Emphasis added.) *Id.* The court further stressed that "[t]his authority exists within the language of R.C. 2929.14(C)(4) and R.C. 2953.08(G)(2). All that is required pursuant to R.C. 2953.08(G)(2) is that the appellate court clearly and convincingly find that the record does not support the trial court's necessity or proportionality findings in light of the actual number of consecutive terms that it imposed and the resulting aggregate sentence." *Id.*

**{¶ 84}** After making these remarks, the court went on to explain the difference

between general principles of deference for appellate courts (like abuse of discretion and so forth) and the type of review that R.C. 2305.08(G)(2) imposes, which is evidentiary (clear and convincing evidence) and applies "to a fact-finder's consideration of the evidence." *Id.* at ¶ 18-20. Consequently, "R.C. 2953.08(G)(2)'s requirement that appellate courts apply the clear-and-convincing standard on review indicates that the legislature did not intend for appellate courts to defer to a trial court's findings but to act as a second fact-finder in reviewing the trial court's order of consecutive sentences." *Id.* at ¶ 20.

{¶ 85} However, differences exist between trial and appellate court fact-finding. First, unlike trial courts, reviewing courts cannot decide for themselves which of the three findings in R.C.2929.14(C)(4)(a)-(c) might apply for purposes of imposing consecutive sentences. *Id.* at ¶ 21. Second, while a trial court's standard of proof is a preponderance of the evidence, "i.e., that when considered as a whole, the evidence demonstrates that the proposition of fact represented by the finding is more likely true, or more probable, than not – an appellate court applies a clear and convincing evidence standard of proof." *Id.* Finally, "the third difference is the inversion of the ultimate question before the court. Whereas the trial court is tasked with determining whether the proposition of fact represented by each finding is more likely – or more probably – true than not, an appellate court's task is to determine whether it has a firm belief or conviction that the proposition of fact represented by each finding is not true on consideration of the evidence in the record." *Id.*

{¶ 86} After clarifying how consecutive sentences must be imposed and reviewed,

*Gwynne* provided "practical guidance" due to the complexity of the involved statutes and confusion caused by prior court interpretations. *Id.* at ¶ 24. According to the court, "[t]he first step in consecutive-sentence review is to ensure that the consecutive-sentence findings under R.C. 2929.14(C)(4) have been made – i.e., the first and second findings regarding necessity and proportionality, as well as the third required finding under R.C. 2929.14(C)(4)(a), (b), or (c)." *Id.* at ¶ 25. Failure to do so requires an appellate court to find a sentence contrary to law and then either modify it or vacate the sentence and remand for resentencing. *Id.*

{¶ 87} Our review here reveals that the trial court made the appropriate findings during the sentencing hearing and in the judgment entry. *See* Tr. at p. 507-508 and Termination Entry (Mar. 25, 2022), p. 2. The sentences, therefore, were not contrary to law in that respect. And, as noted, Taylor has not asserted that the court failed to make the statutory findings.

{¶ 88} The second step is to decide if "the record clearly and convincingly supports those findings." *Gwynne* at ¶ 26. If even one of the findings is unsupported, modification or vacation is required. *Id.* "An appellate court's review of the record and findings is de novo with the ultimate inquiry being whether it clearly and convincingly finds – in other words, has a firm conviction or belief – that the evidence in the record does not support the consecutive-sentence findings that the trial court made." *Id.* at ¶ 27.

{¶ 89} The "clear and convincing review" has two core requirements. The first is that the record contain "some evidentiary support" for the trial court's consecutive sentence findings. *Id.* at ¶ 28. "A record that is devoid of evidence simply cannot

support the findings required by R.C. 2929.14(C)(4); there must be an evidentiary basis upon which these findings rest." *Id.* The record for purposes of this review includes any of the following that may apply: "written presentence, psychiatric, or other investigative reports submitted to the trial court prior to sentencing; the trial court record in the case in which the sentence was imposed; any oral or written statements made to or by the court at sentencing; and any written findings the court was required to make in connection with a grant of judicial release." *Id.* at ¶ 28, fn.6, citing R.C. 2953.08(F)(1)-(4).

{¶ 90} Concerning the second core requirement, *Gwynne* remarked that the existing evidentiary basis, "whatever" it is, must "be adequate to fully support the trial court's consecutive-sentence findings." *Id.* at ¶ 29. In this regard, the court stressed that:

This requires the appellate court to focus on both the quantity and quality of the evidence in the record that either supports or contradicts the consecutive-sentence findings. *An appellate court may not, for example, presume that because the record contains some evidence relevant to and not inconsistent with the consecutive-sentence findings, that this evidence is enough to fully support the findings.* As stated above, R.C. 2953.08(G)(2) explicitly rejects this type of deference to a trial court's consecutive-sentence findings. Instead, a *de novo standard of review applies* to whether the evidence in the record supports the findings that were made. Under this standard, the appellate court is, in fact, authorized to substitute its judgment for the trial court's judgment if the appellate court

has a firm conviction or belief, after reviewing the entire record, that *the evidence* does not support the specific findings made by the trial court to impose consecutive sentences, *which includes the number of consecutive terms and the aggregate sentence that results*.

(Emphasis added; footnote omitted.) *Gwynne*, Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __, at ¶ 29.

{¶ 91} In its supplemental brief, the State notes that *Gwynne* did not discuss what a trial court's findings about consideration of aggregate sentences must entail. State's Supplemental Brief at p. 2. According to the State, the trial court noted that Taylor had a significant criminal history, including juvenile and felony offenses, and it recited the appropriate statutory findings for consecutive offenses. *Id*. at p. 2-3. The State also contends that the trial court did, in fact, consider how many consecutive sentences Taylor would be subjected to, since the court "sentenced Taylor to each count individually and ordered them to be served consecutively, followed by an announcement of his total aggregate sentence." *Id*. at p. 3.

{¶ 92} We are not as convinced as the State that merely reciting the terms of sentences equates with "consideration of the aggregate term" as the Supreme Court of Ohio described it. *Gwynne* at ¶ 2. We are also not as convinced as the State that such a recitation squares with finding that consecutive terms "are necessary to protect the public and whether those terms *are proportionate* to the defendant's conduct," rather than being hypothetical. (Emphasis added.) *Id*. at ¶ 17.

{¶ 93} Nonetheless, what the Supreme Court of Ohio focused on in *Gwynne* was

whether the *evidence in the record* supported the *findings* the trial court made. The findings in question were the *statutory findings for imposing consecutive sentences*. While a trial court may add its own reasons, Ohio cases have consistently held that a trial court is "not required to provide reasons to support its findings." *State v. McClain*, 2d Dist. Champaign No. 2019-CA-12, 2020-Ohio-952, ¶ 31, citing *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 37, and *State v. Hayes*, 2d Dist. Clark No. 2014-CA-27, 2014-Ohio-5362, ¶ 10. Indeed, we have seen many cases in which the trial court's sentencing discussion was limited to reciting the required statutory findings. This is not a criticism; courts have done what the law has allowed.

**{¶ 94}** Our comments also do not mean that a trial court's expressed reasons should be disregarded. A court's observations may be correct or incorrect, and in the latter situation could undermine a consecutive sentence finding. *Compare State v. Amero*, 11th Dist. Portage No. 2020-P-0029, 2023-Ohio-345, ¶ 29 (finding an unclear basis for trial court's statement that the defendant " 'had the entire community in your hands and you destroyed it,' " because the State failed to present any evidence of community harm.)

**{¶ 95}** On the subject of appellate review, the State distinguishes *Gwynne* because it involved a 65-year term for a plea to 31 counts of varying levels of non-violent crimes and a defendant who had no criminal history. In contrast, Taylor's crimes were violent and were committed during "an hours-long campaign of terror that affected several unconnected people and resulted in significant injuries to multiple people, including police officers." State's Supplemental Brief at p. 4. And again, the State stresses Taylor's

criminal history.

{¶ 96} A prior opinion in *Gwynne* noted that:

Over the course of approximately eight years, Gwynne stole thousands of items of jewelry and personal memorabilia from 46 identified residents of 12 nursing homes and assisted-living facilities while she was employed as (or while pretending to be employed as) a nurse's aide.

A grand jury returned an indictment charging Gwynne with 86 felony counts—31 counts of second-degree burglary, 4 counts of third-degree theft, 12 counts of fourth-degree theft, 27 counts of fifth-degree theft, and 12 counts of fifth-degree possessing criminal tools. The grand jury also charged Gwynne with 15 first-degree-misdemeanor counts of receiving stolen property.

Gwynne entered into a written plea agreement in which she agreed to plead guilty to 17 counts of second-degree burglary, 4 counts of third-degree theft, 10 counts of fourth-degree theft, and the 15 misdemeanor counts of receiving stolen property in exchange for the state dismissing the other 55 counts. She agreed to pay restitution and waived her right to appeal "including, but not limited to the grounds listed in [R.C.] 2953.08." Delaware C.P. No. 16CR-I-06-0271 (Sept. 23, 2016). The trial court imposed prison terms of three years for each of the second-degree-burglary convictions, 12 months for each of the third-degree-theft convictions, 12 months for each of the fourth-degree-theft convictions, and 180 days for

each of the misdemeanor receiving-stolen-property convictions. The court then ordered Gwynne to serve the felony sentences consecutively, for an aggregate sentence of 65 years.

*State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, 141 N.E.3d 169, ¶ 3-5.

{¶ 97} During the initial appeal in the case, the Fifth District Court of Appeals characterized "the aggregate prison term as a 'life sentence' for the then 55-year-old Gwynne" and "found that the aggregate sentence was excessive and 'disproportionate to the conduct and the impact on any and all of the victims either individually or collectively.' " *Id*. at ¶ 6, quoting *State v. Gwynne*, 5th Dist. Delaware No. 16 CAA 12 0056, 2017-Ohio-7570, ¶ 29-30. The court of appeals agreed with the need for a prison term and that consecutive sentences were warranted, but it vacated some consecutive sentences, which resulted in a new aggregate prison term of 15 years. *Id*.

{¶ 98} After the State appealed, the Supreme Court of Ohio reversed, finding that the court of appeals had "erred by reviewing Gwynne's consecutive sentences under R.C. 2929.11 and 2929.12"; instead, it "should have analyzed Gwynne's consecutive sentences for compliance with R.C. 2929.14(C)(4)." *Id*. at ¶ 18. The court, therefore, reversed and remanded the case so the Fifth District could consider the sentence under the standard of review for consecutive sentences in R.C. 2953.08(G)(2). *Id*. at ¶ 19-20.

{¶ 99} On remand, the Fifth District affirmed the trial court due to its prior finding that the court had correctly imposed consecutive sentences and because the defendant had agreed during her initial appeal that "the trial court uttered the appropriate 'magic words' to impose consecutive sentences." *State v. Gwynne*, 2021-Ohio-2378, 173

N.E.3d 603, ¶ 24 (5th Dist.)   While the court of appeals stressed its disagreement with the "wholly excessive sentence for a non-violent first time felony offender," it found it had no authority to vacate some, but not all, of the consecutive sentences.   The court also felt constrained by the deferential standard of review accorded for sentencing decisions. *Id.* at ¶ 25.

{¶ 100} As noted, on further appeal, the Supreme Court of Ohio held that the appellate court did have authority to vacate some consecutive sentences and did not have to defer to the trial court.   The court therefore reversed and again remanded the case for consideration of whether the record "clearly and convincingly does not support the consecutive-sentencing findings under R.C. 2929.14(C)(4) as they pertain to the sentencing court's order of consecutive sentences on each count."   *State v. Gwynne*, Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __, at ¶ 2.

{¶ 101} For purposes of considering this issue, we have reviewed all the cases currently citing *Gwynne* (33 total citations, which include 30 Ohio court of appeals' cases, one federal district court case, and two Ohio Supreme Court cases).

{¶ 102} The Ohio Supreme Court cases do not substantively discuss *Gwynne*. One simply reverses and remands for application of *Gwynne*.   *See State v. Polizzi*, 168 Ohio St.3d 1489, 2022-Ohio-4728, 200 N.E.3d 284.   In the other case, the court accepted an appeal on some propositions of law.   However, Justice Donnelly dissented, stating that he would accept all propositions of law and would summarily reverse and remand for application of *Gwynne*.   *See State v. Fraley*, 168 Ohio St.3d 1526, 2023-Ohio-86, 200 N.E.3d 1146 (Donnelly, J., dissenting).

{¶ 103} Of the remaining 31 cases, six cite *Gwynne* for other reasons or do not involve relevant consecutive sentencing issues. *E.g., State v. Dillion*, 10th Dist. Franklin No. 21AP-666, 2023-Ohio-777, ¶ 45 (mentioning *Gwynne's* distinction between evidentiary standards in the context of the fact that "the doctrine of forfeiture by wrongdoing requires the state to prove the doctrine's applicability only by a preponderance of the evidence").

{¶ 104} Of the remaining 25 cases, some involve minimal consecutive sentences. In these situations, courts have affirmed because they lacked a firm conviction that the record failed to support the findings. *E.g., State v. Fleming*, 2d Dist. Clark No. 2022-CA-48, 2023-Ohio-961, ¶ 14 (affirming total consecutive sentence of 24 months in prison for one count of aggravated possession of drugs and one count of possession of cocaine); *State v. Hunter*, 12th Dist. Butler No. CA2022-05-054, 2023-Ohio-1317, ¶ 30 (court could not find that record clearly and convincingly failed to support consecutive sentences of 12 months in prison for grand theft of a motor vehicle in one case and 18 months in prison for grand theft of a motor vehicle offense in a second case); *State v. Smart*, 5th Dist. Tuscarawas No. 2022 AP 06 0018, 2023-Ohio-955, ¶ 25-27 (affirming aggregate 24-month sentence on two counts of gross sexual imposition involving separate child victims, one of whom was under 10 years of age); *State v. Palmer*, 2d Dist. Clark No. 2022-CA-65, 2023-Ohio-1232, ¶ 3, 6, and 15-16 (court could not conclude that record clearly and convincingly failed to support consecutive prison terms of 18 months for vehicular assault and 12 months for possession of cocaine; the trial court did err in finding it was required to impose misdemeanor OVI sentence consecutively, as the statute in question gives

courts discretion on whether to impose such sentences concurrently or consecutively).

{¶ 105} None of the cases (other than one in which a life-without-parole rape sentence was imposed) involve prison terms as lengthy as the 94.5-year sentence that was imposed here. *See State v. Carbaugh*, 5th Dist. Muskingum No. CT2022-0050, 2023-Ohio-1269 (affirming sentence of life without parole plus 14 years for conviction of rape with a sexually violent predator specification and gross sexual imposition. The victim was seven years old.)

{¶ 106} Regarding some defendants who received significantly lighter sentences than Taylor, we note that in *State v. Brabson*, 8th Dist. Cuyahoga No. 111542, 2023-Ohio-449, the defendant was initially charged with aggravated murder and other charges, but pled guilty to aggravated robbery, felonious assault, and involuntary manslaughter. *Id.* at ¶ 1-3. The manslaughter and robbery terms (with firearm specifications) were imposed consecutively, but the assault charge was imposed concurrently, with the total aggregate sentence being 25 to 30.5 years. *Id.* at ¶ 3. The defendant was 19 years old at the time of the crimes and had no prior criminal record. *Id.* at ¶ 2 and 7. However, the court of appeals affirmed the sentence, noting evidence in the record that the "execution-style killing of [the victim] was for no apparent purpose, without any identifiable reason or provocation, and to the apparent surprise of the other two conspirators." *Id.* at ¶ 15.

{¶ 107} *State v. Boyd*, 7th Dist. Belmont No. 21 BE 0048, 2023-Ohio-1120, involved two separate incidents combined in a single indictment. *Id.* at ¶ 2. In the first incident, the defendant was stopped for a traffic violation. He was driving on a

suspended license and LSD was discovered. *Id.* at ¶ 2-3. About five weeks later, while still under suspension and driving a borrowed vehicle, the defendant was involved in an auto accident in which a passenger in another other car was killed. *Id.* at ¶ 4-12. The defendant tested above the legal OVI limit for several drugs, including amphetamine, meth, marijuana, and cocaine. Meth was also found in his vehicle. *Id.* at ¶ 13-16.

{¶ 108} After being charged with seven offenses, including two second-degree felony counts of aggravated vehicular homicide, three OVI counts, and two fifth-degree felony counts of drug possession, the defendant was convicted of all offenses. *Id.* at ¶ 19-21. The trial court merged some offenses and sentenced the defendant to an aggregate sentence of 13 to 18.5 years. The OVI sentences were imposed concurrently, but the drug possession sentences were imposed consecutively to the sentence for vehicular homicide. *Id.* at ¶ 22.

{¶ 109} On appeal, the defendant challenged the imposition of consecutive sentences. After discussing *Gwynne*, the court of appeals found a "plethora of evidence" in the record to support the trial court's conclusion about the defendant's "criminal history and the need to protect society from future crimes." *Id.* at ¶ 69. In this regard, it noted the trial court's emphasis "that the underlying conduct, driving under the influence, has been a recurrent theme for Appellant as evidenced by the prior charges and convictions." *Id.* The court of appeals further stressed that "[t]he harm is particularly serious in this matter as it resulted in a death." *Id.* In addition, the court of appeals noted that the defendant's record included "thirty-three prior criminal charges, a significant amount of which involved conduct similar to the conduct giving rise to the instant charges." *Id.* at

¶ 68. Thus, in even in crimes involving a victim's death, the defendants were given significantly less than life sentences. However, the fact that crimes were treated more lightly in some cases does not control; the circumstances in every case are unique.

{¶ 110} Of the 33 cases citing *Gwynne*, the case with the longest sentence (other than *Carbaugh)* is *State v. Glover*, 1st Dist. Hamilton No. C-220088, 2023-Ohio-1153. In *Glover*, the trial court sentenced the defendant to 60 years in prison based on his conviction of "six counts of aggravated robbery and five counts of kidnapping, all with firearm specifications, for robbing and kidnapping five different individuals at gunpoint." *Id.* at ¶ 1 and 32. These charges were based on a string of robberies that occurred in May and June 2020, during which the defendant accosted various city residents at gunpoint and demanded that they drive to ATMs and obtain funds. Sometimes he made the victims drive to more than one ATM and, in one instance, stole the victim's car when the victim said he had no money in the bank. *Id.* at ¶ 7-20. At the time of sentencing, the defendant was 23 years old, had a single juvenile adjudication, and had a "nontraffic-related conviction, obstructing official business, a misdemeanor." *Id.* at ¶ 59, 89, and 92.

{¶ 111} In considering the defendant's argument that the trial court had erred in imposing consecutive sentences, the First District Court of Appeals made certain prefatory remarks. First, it noted that " 'Ohio law contains a statutory presumption of concurrent sentences for defendants convicted of multiple offenses.' " *Id.* at ¶ 62, quoting *State v. Galinari*, 1st Dist. Hamilton No. C-210149, 2022-Ohio-2559, ¶ 9. The court then stressed that " '[t]he general principle set forth in the Revised Code is that concurrent sentences are the default and consecutive sentences are the exception.' "

*Id.*, quoting *State v. Hitchcock*, 157 Ohio St.3d 215, 2019-Ohio-3246, 134 N.E.3d 164, ¶ 21. Finally, the court observed that " '[c]onsecutive sentences are reserved for the worst offenses and offenders.' " *Id.*, quoting *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, ¶ 21, *abrogated on other grounds, State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph three of the syllabus.

{¶ 112} After making these remarks, the First District discussed the recent decision in *Gwynne,* Ohio Slip Opinion No. 2022-Ohio-4607, __ N.E.3d __. *Glover*, 1st Dist. Hamilton No. C-220088, 2023-Ohio-1153, at ¶ 70-74. Then, as a backdrop for further consideration, the court discussed statutory and case law demonstrating that crimes involving "physical and emotional harm, rather than only emotional harm, generally receive longer sentences." *Id.* at ¶ 75. In this vein, the court noted that "[a] selection of Ohio cases in which the offender was convicted of crimes that caused both physical and emotional harm, such as rape, sexual conduct with minors, murder, attempted murder, and assault, shows that while courts impose lengthy sentences, many are shorter than 60 years." *Id.* at ¶ 76.

{¶ 113} The court further remarked that "[a] review of cases in which a defendant was convicted of crimes that caused emotional trauma, but no or minimal physical harm, showed that courts often impose significantly shorter sentences than 60 years, even when there are multiple offenses and victims." *Id.* at ¶ 77. Ultimately, after reviewing the record, the court clearly and convincingly found it did not support the trial court's findings under R.C. 2929.14(C)(4). *Id.* at ¶ 79-102. The court, therefore, modified the sentence to an aggregate term of 25 years. *Id.* at ¶ 103-105.

{¶ 114} Again, R.C. 2929.14(C)(4) allows consecutive sentences to be imposed "if necessary to protect the public from future crime or to punish the offender" and if they are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public."   The court must also make one of three listed findings.   As pertinent here, the trial court found that R.C. 2929.14(C)(4)(b) and (c) applied.   One finding involves "whether the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."   R.C. 2929.14(C)(4)(b).   The second finding is that an "offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."   R.C. 2929.14(C)(4)(c).

{¶ 115} During the sentencing hearing, the trial court stated that Taylor had caused severe injuries to his victims and that several victims were police officers.   Tr. at p. 506. The court also noted that Taylor had demonstrated no remorse and that his "history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime."   Tr. at p. 506 and 508.

{¶ 116} The basis for imposing some degree of consecutive sentences is clearly and convincingly supported by the record.   Furthermore, we are unable to reach a firm conviction or belief that "the record does not support the trial court's necessity or proportionality findings in light of the actual number of consecutive terms that it imposed and the resulting aggregate sentence."   *Gwynne*, Ohio Slip Opinion No. 2022-Ohio-

4607, __ N.E.3d __, at ¶ 17.

{¶ 117} "[W]hether consecutive sentences are necessary to protect the public is 'completely dependent on whether the defendant's criminal history demonstrates the need for the defendant to be incapacitated by a lengthy term of incarceration.' " *State v. Spires*, 12th Dist. Brown No. CA2022-06-005, 2023-Ohio-665, ¶ 16, quoting *Gwynne* at ¶ 15. At that point in *Spires*, the court of appeals had decided to reverse the defendant's sentence and was instructing the trial court on what to consider on remand. *Id.* at ¶ 13-16. The court further stated in *Spires* that:

> A trial court cannot make this "necessity finding" without considering the overall prison term that it will be imposing, "not whether any hypothetical consecutive sentence might be necessary or proportionate". * * * This is why, when imposing consecutive sentences, a trial court must consider "each sentence on individual counts that it intends to impose consecutively on the defendant *and* the aggregate prison term that will result." (Emphasis added.)

*Spires* at ¶ 16, quoting *Gwynne* at ¶ 14, 15, and 17.

{¶ 118} According to the PSI, Taylor was 30 years old when the current crimes were committed. Taylor had seven juvenile offenses, including domestic violence and assault, with the last juvenile charge being an assault that would have been a fifth-degree felony if brought in adult court. This caused Taylor to be committed to DYS for a brief period in May 2006, when he was 17 years old. PSI at p. 3-4. Seven misdemeanor charges (generally criminal damaging and disorderly conduct) were filed against Taylor

between 2007 and 2020. *Id.* at p. 4.

**{¶ 119}** In addition, Taylor had three prior felony convictions. The first was a 2009 first-degree aggravated robbery conviction in Delaware County, Ohio, which resulted in a five-year prison term that began in March 2009 and ended on March 7, 2014. The second conviction occurred in June 2014, was for second-degree burglary, and resulted in a two-year prison sentence. Taylor was then released on April 14, 2016, and was placed on post-release control. *See* PSI at p. 5 and online docket for Greene C.P. No. 2014 CR 266 (accessed on Apr. 27, 2023). Finally, a fifth-degree felony charge for harassment of an inmate (bodily fluid) was filed against Taylor on January 31, 2019. After Taylor pled guilty to that charge, he was sentenced to community control, and that was terminated successfully on March 21, 2019. PSI at p. 5 and online docket for Montgomery C.P. No. 2019 CR 37 (accessed April 27, 2023).

**{¶ 120}** It is also true that by the time of sentencing, Taylor had incurred two additional felony charges while in jail pending trial: a second-degree felony escape charge and another harassment of an inmate charge. PSI at p. 5. The trial judge for these cases was also the judge who presided over the current case. *See* online dockets for Montgomery C.P. No. 2021 CR 3789 and Montgomery C.P. No. 2022 CR 146.

**{¶ 121}** The State's sentencing memorandum asked the court to impose the "maximum" prison term of 64.5 years. State's Sentencing Memorandum (Mar. 22, 2022), p. 1 and 5. In the memorandum, the State said that "The Defendant had been released from prison on August 18, 2019, where he had served a term for F2 Burglary." *Id.*, p. 2. This would have been only two to three days before the current crimes occurred and was

one of the State's reasons for asking for this sentence. *Id.* at p. 5.

**{¶ 122}** However, the State was incorrect. As noted, the PSI (and court records) indicate that Taylor had been sentenced to two years in prison in 2014 for an "F2 Burglary" and had been placed on post-release control on April 14, 2016. Taylor's parole officer also stated that, prior to the current crimes, Taylor had been complying with post-release control. PSI at p. 6.

**{¶ 123}** Additionally, the PSI indicates that Taylor began using various drugs and alcohol at age 13 and, since 2019, he had used methamphetamine and cocaine daily and crack two to three times a week. *Id.* at p. 7. In 2019, Taylor was using these drugs, was also drinking two 24-ounce beers daily, and used benzodiazepines daily.

**{¶ 124}** The record is silent on whether the trial court was influenced by the State's incorrect statements. However, the court imposed a higher sentence than the State requested, which could imply that the court was not affected by the State's comments. Furthermore, the record reveals that Taylor had spent most of his life in prison or jail, had not responded to any prior sanctions, and continued to commit crimes while in jail and awaiting trial in this case. There was no basis upon which to conclude that, if Taylor were released from jail, he would refrain from committing dangerous crimes and being a danger to the public.

**{¶ 125}** Because we found error in the maximum sentence under the Reagan Tokes Law, the third assignment of error is sustained in part and overruled in part. We will remand the case so the trial court can correct the sentence.

V.   Imposition of Financial Sanctions

{¶ 126} Taylor's fourth assignment of error states that:

The Trial Court Erred When It Imposed Financial Sanctions on Taylor.

{¶ 127} Under this assignment of error, Taylor contends that the trial court erred in imposing restitution and in ordering that he pay court costs.   Taylor notes that he will be over 90 years old when he is released from prison.

{¶ 128} Taking the issue of restitution first, the court ordered Taylor to pay $135 to C.L.   This was the amount mentioned in the PSI.   While there were multiple victims, Taylor was the only one who documented loss; the remaining victims had no economic loss, failed to provide documents, or did not respond.   *See* PSI at p. 9-15.

{¶ 129} "R.C. 2929.18(A)(1) gives a sentencing court discretion to order restitution but not in an amount greater than the amount of economic loss suffered by the victim as a direct and proximate result of the commission of the offense.   The court may base the amount of restitution on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information."   *State v. Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, ¶ 3.   "The court does not need to expressly state that it considered a defendant's ability to pay, but the record should contain evidence that the court considered this."   *State v. Donaldson*, 2d Dist. Montgomery No. 29473, 2023-Ohio-234, ¶ 51, citing *State v. Phillips*, 2d Dist. Montgomery No. 29087, 2022-Ohio-1262, ¶ 23.

{¶ 130} "On review of a trial court's imposition of restitution as part of a felony

sentence, we apply the standard set forth in R.C. 2953.08(G)(2)(b), inquiring whether the imposition of restitution is clearly and convincingly contrary to law." *State v. Brown*, 2017-Ohio-9225, 103 N.E.3d 305, ¶ 25 (2d Dist.), citing *Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, at ¶ 7 and 10. (Other citation omitted.)

**{¶ 131}** The sentencing transcript indicates that Taylor did not challenge the restitution amount, nor did he request a hearing. Therefore, he has waived all but plain error. *Donaldson* at ¶ 54, citing *State v. Snowden*, 2019-Ohio-3006, 140 N.E.3d 1112, ¶ 88 (2d Dist.). (Other citations omitted.) After reviewing the record, we find no plain error or any error. The trial court stated that it had considered Taylor's ability to pay and that the PSI did not indicate Taylor had any physical injuries or aliments that would prevent him from working in the future. Tr. at p. 508-509. Therefore, the court did more than required. Furthermore, while Taylor stood to be confined for a lengthy period, the restitution amount was nominal.

**{¶ 132}** As to imposition of court costs, "[b]y statute, the imposition of court costs on all convicted defendants is mandatory." *State v. Taylor*, 161 Ohio St.3d 319, 2020-Ohio-3514, 163 N.E.3d 486, ¶ 6, citing R.C. 2947.23(A)(1)(a). This is true even if a defendant is indigent. *Id.*, citing *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8. Moreover, while R.C. 2947.23(C) allows courts to waive payment of costs, the court does not have to consider a defendant's ability to pay in making this decision. *Id.* at ¶ 16.

**{¶ 133}** Here, Taylor did not ask the trial court to waive court costs, nor did he file an affidavit of indigency with the court. Therefore, there is no basis upon which to

conclude that the court erred in imposing court costs.   Moreover, under R.C. 2947.23(C), the trial court "retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution, including any costs under section 2947.231 of the Revised Code, at the time of sentencing or at any time thereafter."   Consequently, Taylor still has the ability to ask the court to modify imposition of court costs.   *E.g., State v. Brandon*, 2d Dist. Clark No. 2019-CA-53, 2020-Ohio-5406, ¶ 24.   This is not to say that a modification request will be successful.   However, the statute does contemplate such motions.

{¶ 134} Accordingly, the fourth assignment of error is overruled.

VI.   Conclusion

{¶ 135} Taylor's first, second, and fourth assignments of error having been overruled, and his third assignment of error having been sustained in part, the judgment of the trial court is affirmed in part and reversed part only as to the maximum sentence ordered under the Reagan Tokes Law.   This cause is remanded solely for correction of the sentence.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.